Submitted on brief October 4, affirmed October 12, 1920.

### COLE v. COLE.*

(192 Pac. 637.)

**Marriage—Evidence Held not to Show Duress to Procure.**

1. Evidence *held* insufficient to show that defendant exercised any duress on plaintiff wife, suing to annul the marriage, to compel her to marry him.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

In Banc.

This is a suit to annul a marriage on the ground of duress. The material allegations of the complaint

---

*For authorities discussing the question as to what constitutes duress for which marriage may be annulled, see notes in 43 L. R. A. 814; 27 L. R. A. (N. S.) 803; L. R. A. 1916C, 706.          REPORTER.

are in substance as follows: That on or about the hour of 10:30 o'clock P. M. on the sixth day of March, 1918, in the City of Portland, Oregon, and in the immediate vicinity where plaintiff was then residing, the defendant approached the plaintiff, and by force and threats of bodily injury and death compelled the plaintiff to enter an automobile operated by the defendant, and immediately thereafter the defendant drove said automobile to the City of Oregon City, Oregon, and then and there, by continuous threats of injury to the plaintiff, forced the plaintiff to accompany him about said city for the purpose of securing a marriage license, in which the defendant failed to succeed, and thereafter and during the hour of midnight of said and the succeeding day the defendant, by force, compelled the plaintiff to return to the City of Portland, and to spend the night with him in that certain hotel commonly known as the Clifford Hotel; that on the following day, by continued force and threats, defendant forced the plaintiff to again accompany him to Oregon City, and after being unable to secure a marriage license compelled plaintiff to return with him to Portland, where the defendant secured two persons to act as witnesses to a marriage license, and immediately after securing a marriage license the defendant forced the plaintiff to marry him in said City of Portland; that immediately after said marriage ceremony the defendant again forced the plaintiff into his automobile and to accompany him to the City of Salem, Oregon, and to remain with him in a hotel during the night of said day; that on the following day the defendant again forced the plaintiff to accompany him in said automobile to the City of Vancouver, Washington, and to spend the night of said day in a hotel in said City of Vancouver; that on the following day, by said force and

threats, the defendant compelled the plaintiff to return with him to Portland, and to remain with him said day and night and the following day and night at the aforesaid Clifford Hotel; that on the succeeding day the defendant, by force and threats, compelled the plaintiff to accompany him to the City of St. Helens, Oregon, and to spend the night of said date at the home of H. C. McCormick, a relative and friend of the defendant; that on the subsequent morning the defendant forced the plaintiff to accompany him about the city and vicinity of St. Helens; that in the afternoon of said date the plaintiff succeeded in liberating herself from the force and influence of the defendant, and returned to her said home in Portland, where the plaintiff has ever since resided, separate and apart from the defendant; that said marriage was consented to by the plaintiff for the sole purpose of saving her life and that of her fiance; that the defendant on the sixth day of March, 1918, and on prior occasions, and during all the times herein mentioned, threatened the plaintiff that, unless she would consent to marry him, he would kill her and her fiance; that the defendant knew on said sixth day of March, 1918, and prior thereto, that the plaintiff was engaged to be married; that at the time the defendant forced the plaintiff for the first time into his said automobile he threatened the plaintiff that, if she ever left or attempted to leave him or his said automobile without his knowledge or consent, he would kill her upon sight, which threats were repeated frequently during all of the times herein mentioned; that the plaintiff was afraid of the defendant, and believed that he would kill her if she made any attempt to liberate herself, and while laboring under said belief, force,

and threats consented to said marriage and to accompany the defendant to the places aforesaid, and to cohabit with him.

The answer denied the charges of force and threats and contained a plea of former adjudication, which it is unnecessary to advert to further.

AFFIRMED.

For appellant there was a brief submitted over the name of *Mr. G. G. Schmitt.*

For respondent there was a brief prepared and submitted by *Mr. Frederic H. Whitfield* and *Mr. Glenn R. Metsker.*

McBRIDE, C. J.—The charges of threats and force are utterly unsustained by any testimony, except that of plaintiff. They are vigorously denied by the defendant, and there is not a single circumstance in the case to support her testimony, except the fact that a week after the ceremony she left the defendant during his absence and returned with her relatives and a former lover to Portland.

A large number of letters passed between the parties before the marriage, all breathing undying love for each other, and freighted with paper kisses, and pen and ink embraces, indicating that plaintiff was doing at least her share of the courtship. About March 1, 1918, she wrote defendant a letter, urging him to come from St. Helens to Portland. In all of this correspondence, which is in the usual exuberant style of infatuated lovers, the defendant called himself "Daddy" and the plaintiff assumed the *nom de plume* of "Daughter," although the letters themselves are anything but daughterly or fatherly.

According to plaintiff's statement, she was engaged to one Johnson and had promised to marry him about March 9, 1918; but her letters indicate that she had been weighing the attractions of her two admirers, with a decided preponderance of affection for defendant. The letter of March 1st, above alluded to, is as follows:

"My dear Daddy:

"Received your letter a few days ago and was sure glad to hear from you once more. I had begun to think you were angry at me, but see I am mistaken.

"J. has been watching me very closely lately and this is the first chance I have had to write to you, and he has certainly surprised me too. He has his 'shack' furnished grand and expects me to move in it in a few days and I am not a bit enthusiastic over it. Maybe you will think I am a very ungrateful person, but I have been thinking too much of my Daddy and me wants you to come right away cause if you don't it will be too late. Please don't mention getting this letter to anyone that might see J. and tell him about it, because he would sure cause some trouble if he thought I wrote to you at any time much less now. He knows of me writing one letter to you so be careful. We both have to be careful as you know how all the folks have talked and acted while I was down at St. Helens.

"Hope you will be ready to come as soon as you receive this. Could you go to the hotel I mentioned before in one of my letters and then you can call me (Main 4864), or I call you. If I don't happen to be in when you first call just leave your number. Don't call long distance or leave your name as the landlady tells all she hears.

"With lots of love and kisses, from your
                                        "DAUGHTER."

In answer the defendant wrote as follows, the date being uncertain:

"My dearest Daughter:

"Received your startling letter tonight and sure was surprised to hear how things are going with you.

"Dearest girlie, if you love me wait until Wednesday night as I cannot get away before that, but sure will be up Wednesday night and will go to the same hotel I stopped at the first time we came to Portland.

"For the love of Pete don't do anything you will be sorry for later for daddy is coming up to you just as fast as he can, but he cannot get away now as he is working on one of the dynamos and cannot get away, but sweetheart if you are afraid to wait come on down here and we can get married and settle all the trouble at once.

"Honey girl please wait until I can come up to you, for I surely would come right tonight if it was not a question of putting the lights out in town, why could not this come up some other time but just now, for I would be on my way to you now, instead of writing this letter.

"I would telephone to you, but you said no and this is the only way I can reach you.

"Sweetheart write and tell me you are waiting for daddy will worry his head off until he hears from you again, so dearest please write and tell him you are his yet.

"Gee I feel so bad about not being able to come to you that I cannot think straight, so I will close, hoping all the time you are waiting for daddy, or if you cannot wait, you will come down here to him never to leave him again, for daddy sure does want you more than ever tonight and will worry all the time until he hears from you, or better luck sees you, again.

"Hoping you can manage to put off your friend until you see me I am with all the love for you in the world, Your

"DADDY."

"P. S.—If kissing the ring can help any I will kiss it every minute until I see you again.

"DADDY."

Plaintiff admits receiving a letter of this date, but on cross-examination denied that the letter produced was that letter, and averred that it was one substituted for the original; but this does not seem to be the case. Later, and on March 4th, he wrote again, which letter plaintiff admits she received:

"Dearest Daughter:

"This is the last time, I hope, that I write to you with that heading.

"I spoke to Mr. & Mrs. McC today and they seem very much pleased about it and everything is all arranged for Wed. so I will leave here about 9 o'clock in the morning so you can expect to hear from me about eleven so be ready about then.

"Gee I can hardly wait for the time to come and the sooner the better it will suit me.

"I was up at 6 o'clock this morning and finished reading the meters and the dynamo is working fine so all there is to do is to wait until Wednesday to come.

"Daddy hopes you are thinking of him as he is thinking of you, for he sure would be disappointed if anything should go wrong.

"Sweetheart there is nothing more to write about now so I will close until the time comes for I sure will be there, if I have to come on one leg so cheer up from

"DADDY.

"P. S.—Just kissed the ring 3 times and was thinking about those kisses of yesterday and wished I had some more right now.

"DADDY."

"Arrived home safe and nobody knew where I had been.

"DADDY."

This correspondence is given to indicate the undisputed relations of the parties up to the time plaintiff claims she was forcibly abducted and compelled to go through a marriage ceremony. They cer-

tainly indicate that up to the time the letter was mailed a willing lady was summoning to her side a willing lover.

It will be seen from the letter last quoted that defendant, in answer to plaintiff's request, had fixed Wednesday, which was March 6th, as the day when he would meet her in Portland. So far both parties are agreed. From here on their accounts diverge.

Her account is that on the evening of March 6th she returned with her relatives and others from a visit in the country and was put down on the sidewalk in front of the house where she was rooming, having with her two grips, containing, among other things, her wearing apparel, and that after the machine—which had conveyed her there—had driven away defendant appeared and approached her, and by force and threats of bodily injury forced her to enter his automobile and drove to Oregon City for the purpose of procuring a marriage license; that, failing to secure the license they returned to Portland, where the defendant, by continued and repeated threats, forced her to stay all night with him at the Clifford Hotel, and the next day compelled her to accompany him to Oregon City, and after a second failure to procure a license returned to Portland, and by the aid of two of his friends procured a marriage license and compelled plaintiff to go through the form of marriage with him; that the next day, being the 8th of March, defendant compelled plaintiff to go with him to Salem, Oregon, where they remained one night and on the 9th they went to Vancouver, Washington, where they spent one night. Returning to Portland the next day, they again spent the night at the Clifford Hotel, and on the next day defendant took plaintiff to St. Helens, where they spent the

night at the home of Mr. and Mrs. McCormick,
friends of defendant; that the morning after their
arrival in St. Helens defendant compelled plaintiff to
accompany him about the city and vicinity of St.
Helens; that during the afternoon of that day rela-
tives of plaintiff, accompanied by Mr. Johnson, plain-
tiffs' other suitor, having discovered the whereabouts
of plaintiff, called at the McCormick residence while
the family and defendant were away, and she availed
herself of this opportunity to escape from the force
and influence of defendant, and returned with them
to Portland, leaving her luggage, wraps, and bonnet
at the McCormick residence; that during all the time
from March 6th until the plaintiff made her escape,
the defendant kept her continuously in his presence
and under his domination and influence by threats
of violence and death, allowing her no opportunity
to meet or communicate with any of her friends or rela-
tives.

Such in brief is the story of the marriage, as re-
lated by plaintiff, with a wealth of lurid details
which lack of space compels us to omit.

The story of the defendant is, that he first met
plaintiff in October, 1917, and fell in love with and
continued to pay her attention and correspond with
her from that time until their marriage; that in Jan-
uary there was an indefinite engagement to inter-
marry some time in April; that upon receiving the
letter from her which is quoted above he came to
Portland on Sunday, March 3d, arriving about 8
o'clock A. M., and went to the Clyde Hotel, and rang
her up at her rooming-house, and met her at 12th
and Clay Streets, where they got into defendant's
automobile and drove about over town in it; that she
showed him Johnson's house, and it was agreed that

he would come up Wednesday, when they would be married; that he was to arrive in Portland about 11 o'clock A. M., call her up, and if she was not there he was to go to the Clyde Hotel and wait until she called him up; that he went to the Clyde Hotel, and about 4 o'clock P. M. she called him up and told him she was down at Olds, Wortman & King's, and asked him to meet her; that he went down and met her on the 10th Street side of Olds, Wortman & King's; that she had a grip with her, with her things in it, which she gave to him and he put it in the car; that they drove out to 25th Street and stopped the car for 15 or 20 minutes, when she gave him a brass ring and requested him to get a wedding ring of that size, but, the stores being closed, he was unable to get the ring; that he left her very near her rooming-house; that she told him she had to go out for a ride with her younger brother; that she didn't want to see Johnson again, but wanted to say good-bye to her younger brother before she went away with defendant, and that defendant was to go to the hotel and stay until she called him up; that about 11 o'clock she called him up and said she was ready to go then, and he took his grip and hers and drove his car to about a block from her rooming-house, where she met him, carrying with her two other grips, which were put into the car; that she expressed herself as tickled to death to get away from Johnson.

Defendant is modestly silent as to where they went or where they stayed Wednesday night; but it appears from plaintiff's testimony they stopped at the Clifford Hotel. Next day, according to defendant's story, they drove to where two of defendant's friends were working, and defendant induced them to go with him to the courthouse to get a license and to

accompany them to the First Congregational Church of Portland, where they found the secretary of the pastor and the former secretary, and stated their errand. The secretary called up the pastor, and after a short delay he arrived and the marriage ceremony was performed. Defendant then states that they started in his auto on a wedding trip to Eugene, but on account of bad roads they stopped overnight at Salem, and returned next day to Portland, and from there to Vancouver, Washington, where they spent the night, and, returning next day to Portland, spent the night at the Clifford Hotel. The next day they went to St. Helens, which was defendant's home, and on the invitation of Mr. and Mrs. McCormick spent the evening and night at their residence. That plaintiff accompanied defendant about the town during the day, and in the afternoon went with defendant to the McCormick home, they being absent during the day, and remained there while defendant went about his work. Her relatives arriving there, she went away with them without the knowledge of defendant, and shortly thereafter began a suit for divorce, and being nonsuited in that, commenced this suit to annul the marriage.

We have given substantially the main points in the testimony of both the principals in this proceeding. The burden of proof was upon the plaintiff to establish by the preponderance of testimony that she was induced by the threats and menaces of defendant to go through the form of a marriage with him. In this she has failed. There is not a single witness or circumstance that corroborates her testimony, and if the case rested upon her evidence and the defendant's alone, we would be compelled to affirm this decree. But the circumstances are against her; her letters

indicate a lively affection for the defendant, and the letter quoted at least implied an invitation to come up and marry her, to save her from having to marry Johnson. It is true she does not say this in so many words, but the implication is plain. She was on the streets of a populous city, where she says defendant forced her into the car, and a single outcry would have brought assistance, yet she made none. She was with him at the Hotel Clifford, and gave no intimation that she was being forced to remain there. She was with him in daylight at Olds, Wortman & King's store, and was silent when she could easily have called for help. She went in his company and that of his witnesses to the courthouse for the purpose of procuring a license, and yet did not suggest to either of these gentlemen that she was being abducted, and was practically a prisoner of defendant. She went through the ceremony of marriage without intimating by word or act that she was being compelled to marry. She went with defendant to the home of Mr. and Mrs. McCormick, and was apparently in good spirits there, laughed and joked, and said she was to marry another fellow; that she was to call Mr. Cole up at 10 o'clock Wednesday, but did not call him until 4 o'clock in the afternoon, giving as a reason for not calling him that she was undecided as to which fellow she was to marry; told about the home the other fellow had; said it was beautifully furnished, and she would like to have had the home, but she couldn't stand to think of what had to go with it; and that she was anxious to be settled and she thought they would be very happy.

It is noticeable that neither the pastor, the two secretaries, nor the two witnesses observed any indication of unhappiness in her appearance or conduct.

To everyone with whom she came in contact she presented the appearance of a satisfied bride. The plaintiff was 26 years of age, and had lived twelve years in Portland, and was not so unused to the ways of the world as not to know that she could easily have secured assistance, if such assistance was desired. Whatever the facts may be, she has not made out her case by that outweighing of the testimony which the law requires. It rather appears to be a case in which she was in the first instance undecided as to which suitor to cast her lot with, and having made a hasty decision, afterward repented of it, and began to long for the new house and fine furniture which she had forfeited by marrying the St. Helens mechanic.

Her letters indicate that she is of a volatile, frivolous nature, and this probably led her into a marriage which she now regrets, and possibly with reason, but in view of all the testimony the decree must be affirmed, and it is so ordered.        AFFIRMED.