Argued October 7; reversed November 24, 1931

In Re Morley's Estate

MORLEY et al. *v.* SILVERTON HOSPITAL

(5 P. (2d) 92)

*Omar C. Spencer,* of Portland, and John Carson, of Salem (Carey & Kerr, of Portland, and Carson & Carson, of Salem, on the brief), for appellant.

*W. C. Winslow,* of Salem, and Roy F. Shields, of Portland, for respondents.

ROSSMAN, J. The only issue difficult of solution is whether Gerome Morley on the 16th day of November, 1925, that being the date of his alleged will, possessed testamentary capacity. Morley was born January 15, 1858, within a few miles of Silverton where, on the 2d day of February, 1926, he died in the Silverton Hospital. His entire life was spent in that community. He was one of a family of sixteen children. He died a bachelor. Until January 16, 1907, he had continuously resided upon the farm owned by his parents, remaining with his father even after his mother's death. January 16, 1907, when he was 49 years of age, he left the family home and took up his residence with his sister, Mrs. Ella McCleary, and her husband. He left the McCleary home March 14, 1919, and thereafter lived at the Cottage hotel in Silverton where he remained until illness necessitated his removal to the Silverton Hospital. Morley acquired a farm of his own adjacent to that of his parents when he was 21 years of age, and sold it in 1905. Thereafter he engaged in

no gainful occupation, but spent much of his time in hunting, fishing, swapping stories and frequenting a local rookery known as the "Liars' Bench" in front of Webb's livery barn in Silverton. One of the witnesses described him thus: "He was always telling jokes and joshing and develing a fellow." After the sale of his farm he depended upon the interest-earning capacity of his capital for a livelihood. All witnesses agreed that he had no faith whatever in charities and shunned Salvation Army and Red Cross solicitors. No one recalled ever having heard of Morley making a contribution to any benevolent cause except his purchase of $100 worth of stock in the Silverton Hospital at the time when the community financed the construction of that institution. Although many members of the Morley family testified that no estrangement had ever occurred between Gerome and his brothers and sisters, yet it does not appear that he maintained any intimate contacts with them. No one mentioned his presence at any family reunions, dinner parties, picnics or similar gatherings. Apparently he was a crusty old bachelor who trod the lonely way of isolation, content with but few contacts with the rest of mankind. His was not the genial nature of generous impluses, and seemingly he did little to make the lives of others happier. Obviously, his accumulation of $22,000 was the only noteworthy achievement in a life otherwise destitute of ambition.

In March of 1923, about two and one-half years before the execution of the will, Morley suffered a cerebral hemorrhage which affected his entire left side. His physician, Dr. Clarence W. Keene, described his condition thus: "He had a hemiplegia, complete hemiplegia at that time." He was at once taken to the Silverton Hospital where he remained "a couple of

weeks or more." At that time it was discovered that Morley was subject to high blood pressure, ranging as high as 220 which was later reduced to 160. According to Dr. Keene, Morley's mind was affected by this stroke, but returned to its normal condition a week or ten days after his admission to the hospital. At the conclusion of the "couple of weeks or more" Morley was able to walk out of the hospital and get around freely with the aid of a cane. In July of 1923 he suffered another cerebral hemorrhage and was again taken to the same hospital where he remained for a short time. Dr. Keene described this stroke as "a slight one." At this time it was discovered that Morley was also affected mildly with diabetes. In June of 1925 he suffered what Dr. Keene believed was a third cerebral hemorrhage and was again confined in the Silverton Hospital, this time for approximately a month. This attack, like its predecessors, also affected his mind for about a week. November 1, 1925, while Morley was sitting upon the aforementioned bench in front of Webb's livery stable, his companions discovered him to have become entirely "irresponsive" and to have lost all control over himself. He was removed to the Silverton Hospital and his condition was diagnosed as a fourth cerebral hemorrhage. This time he remained in the hospital until death overtook him. His mental condition during this confinement in the hospital, especially upon the 16th day of November when his signature was attached to the will, is the subject of controversy. At this time he was still afflicted with diabetes and was also subject to high blood pressure, although the latter condition had been somewhat remedied. The fourth stroke had also impaired his vision, but about the middle of the month his eyesight had also improved. The hospital concedes that, on No-

vember 1st and for the first three or four days following that time, Morley was entirely unconscious but contends that within two or three days after November 1st his mind showed indications of improvement; that about a week or ten days after November 1st his mind had cleared to such an extent that he was aware of his surroundings and of his wants; and that on November 16th his improvement had progressed to such an extent that he possessed. testamentary capacity.

We come now to the events which transpired on November 16th. In the morning of that day, according to the testimony of Mrs. May Day, superintendent of the hospital, Morley told her "that he desired to make his will" and she, responding to his request that the names of some local attorneys be suggested, "named over Adams and Custer Ross" together with a third one. Morley, having expressed a preference for Mr. Ross and having told her to telephone him, she did so asking him to come to Morley's room in the hospital. Shortly before 1 o'clock in the afternoon Ross arrived. According to his testimony, Mrs. Day met him in the hall of the hospital with the request that "if I had an opportunity to do so suggest to him (Morley) to leave the hospital $2,000." Ross informed Mrs. Day that it would be impossible for him to make any suggestions whatever, and was then shown to Morley's room. He testified that thirty years ago he had become acquainted with Morley, that the acquaintanceship had continued ever since, and that "his people were old-timers and so were mine, and we had all grown up to know each other." He added that he had served Morley in the capacity of an attorney upon "some small matters" in the past years. He testified that when he entered the room the latter recognized

him and "we chatted a short time about hunting and fishing, and I believe that his brother Charley had that day brought him in a fish, and after some five or ten minutes, perhaps fifteen, he said that he had asked someone, I believe he said Mrs. Day, to have me come down, that he wanted to fix up his business, and I then inquired of him what property he had." Ross testified that he replied: "Including bonds, it is about $22,000." The witness continued: "I asked him then if he had made up his mind as to how he wished to dispose of this property, and he told me that he had, that he wished to give it to the hospital." Ross added that he then protested, saying, "that was too much, he would want to give some to his folks" but that Morley declared, "those of his folks that had anything, had more than he did, and the ones that didn't have anything, what he could give them wouldn't help them any." Ross continued: "I said to him, 'Gerome, how about Kitty's children?'—that is his sister, deceased, Kitty Barkhurst—and he said to me, 'You know as well as I do, there never was a Barkhurst that amounted to anything', and then I mentioned the McClearys, I said, 'What about the McClearys?' and he said he didn't wish to give them anything." Ross testified that later in the conversation he inquired whom Morley wished to nominate as executor and to serve as attesting witnesses. He replied by instructing Ross to insert in the will the name of one Gunderson, cashier of the Coolidge & McClaine Bank of Silverton, as executor, and that he wished the same individual, together with Ross, to serve as attesting witnesses. When Ross suggested that it would be inadvisable to have Gunderson act in this dual capacity, Morley requested him to "get one of the boys from the bank" to act as the other witness. Ross thereupon left, saying that he would do as direct-

ed. He then called at the bank, secured Mr. Gunderson's consent to serve as executor, and requested a Mr. Campbell, assistant cashier of the bank, to accompany him to the hospital later in the afternoon to serve as an attesting witness when the will was ready for execution. Campbell had known Morley for five or six years, had attended to his wants at the bank and at times had discussed business matters with him. Before proceeding to draft the will, Ross called upon Dr. Keene, who had attended Morley in all of the aforementioned sieges of illness and who was still his physician, and inquired "whether or not he regarded Mr. Morley as competent." Although Dr. Keene had visited Morley that morning, he called upon him once more and then told Ross "Morley's mind was just as good as it ever was." About an hour after his first visit Ross returned to the hospital, accompanied by Campbell, and taking along the requested document. Upon arrival at his bedside, according to the testimony of Campbell, Morley greeted him by mentioning his name. Campbell testified: "We visited with him for ten or fifteen minutes, I presume, and discussed fishing and hunting, things that Gerome was more or less interested in. After we had visited with him for a time, he turned to Mr. Ross and said, 'Custer, have you attended to that business for me?' and Mr. Ross produced the will and read it to him." Q. "What did Gerome Morley say then?" A. "Mr. Morley said, 'That isn't just what I had in mind. There is no provision made for my old friends or the Morley family, and I wanted that in.' Mr. Ross said, 'All right, we will make another one.'" Ross testified: "He (Morley) said he wanted to reserve a room there for the Morley family and for his old friends,—if they wasn't using it to let some poor people have it. * * * I suggested that he

might make such an arrangement with Mrs. Day, and it wouldn't be necessary to redraft the will." But when Morley insisted that he wanted the provision inserted in the will Ross acquiesced and returned to his office so as to redraft the document. Campbell returned to the bank. Later in the day both again called at the hospital and after Ross had read the newly prepared instrument, Morley, according to Ross, replied, "Yes, that is the way I want it." Campbell testified likewise. Following is a copy of the document:

"*Know All Men By These Presents,* That I, Gerome Morley, do hereby make, publish and declare this to be my last Will and Testament, and my sole and complete act and deed, in manner and form following, that is to say:

"First. * * *

"Second. All the rest, residue and remainder, of my estate, real, personal and mixed, of whatever kind and wherever situate of which I may die seized and possessed, and to which I may be entitled at the time of my death, I give, devise and bequeath the same unto The Silverton Hospital, a corporation, of Silverton, Oregon, to have, hold and possess the same unto said Silverton Hospital, its successors and assigns forever. I direct that there shall be reserved and set apart by and in said Silverton Hospital a room which shall always be available for the use of members of the Morley family and all my old friends; and when such room is not being so, by said designated persons, actually used, that the same be applied to the use of worthy, needy or destitute persons.

"Third. I hereby nominate, constitute and appoint M. G. Gunderson to be the executor of this, my last Will and Testament, and having full faith in his integrity and ability, I direct that he act hereunder without being required to give any undertaking for the faithful performance of this trust.

"In Testimony Whereof, I * * *""

The two men then propped Morley up in the bed and he signed his signature to the will. Many specimens of Morley's signature upon checks were introduced in evidence and readily warrant the conclusion that he could scarcely qualify as a good penman. The signature upon the will is even inferior to that written on the checks. Ross believed that Campbell steadied Morley's hand while the signature was being written. Based largely upon this testimony, contestants predicate their charge that the will was not properly executed. Campbell's recollection was that after Morley had written his first name that he (Campbell) moved the magazine which afforded hard surface under the will so that Morley could write the latter part of his name with greater ease.

It is apparent from the above that on November 16th Ross, an old acquaintance of Morley's who had served him on past occasions as attorney, saw him at the hospital three different times upon business which bore directly upon the element of testamentary capacity, and that Campbell, who in the course of several years time had waited upon Morley when the latter transacted business at the bank, visited him upon two occasions which likewise concerned Morley's capacity to execute a will. Ross testified that he noticed no difference in Morley's conversation from that which he observed on previous occasions "except that he complained of having pain from neuritis." When asked for his opinion concerning Morley's mental soundness on November 16th, he replied, without hesitation, "There was no question about it in my mind." Campbell testified that Morley was obviously in poor physical condition but that "he appeared to be quite himself in talking and visiting with him," and expressed the opinion, without reservation, that Morley was of sound mind.

It will be further observed that Dr. Keene saw Morley at the hospital twice on November 16, his second visit being the result of a request from Ross for an opinion concerning Morley's ability to make a will. Dr. Keene testified that he was well acquainted with Morley and had been his physician "occasionally for minor things" for at least ten years time. He had served him during each of the aforementioned illnesses and testified that in the years 1923 and 1924 Morley called at his office "on numerous occasions to see me." Dr. Keene swore that immediately following November 1st "he began to clear up, oh, I should think in about two or three days he began to say things and talk and all that kind of thing, that is my recollection about it, but I think possibly it was a week or ten days or along about a week, he began to have pretty fair periods, that he would be quite straight about things." Describing the visit resulting from Mr. Ross's request of November 16th, Dr. Keene testified: "I talked with him generally upon such general subjects of conversation as you would naturally talk to a patient about, I asked him how he was and talked to him about the weather, and about the usual subject he was interested in, about hunting, and I am not sure, but he always brought up the subject, pretty nearly always when we had a visit, about Alf Coolidge, he would ask when he was expected down." Dr. Keene expressed the opinion that "on November 16th I think he had recovered his mentality." Q. "Entirely?" A. "As much as any sick man would * * * well, my opinion is, I have occasion to deal with sick people, and if Mr. Morley was not competent on that day there is no sick man who is."

In addition to the above witnesses, the proponent called the following: one William Eisenhart, who had known Morley as a neighbor and a fellow-

hunter for a quarter century or more, testified that about four years ago Morley "told me he was going to deed it (his property) to some charity instiution." In addition to making this declaration, Eisenhart added that Morley declared "he didn't want his relations buying automobiles with his money, and he was going to give it to something that would do some good." He added that the last time Morley expressed himself to that effect was "over a year ago, possibly two years." Eisenhart testified that when he visited Morley at the hospital the latter "talked just as rational as any time I ever talked to him in my life." Charles A. Reynolds, assistant cashier of the aforementioned bank, who had known Morley for about twenty-one years, visited him in the hospital about January 1, 1926, for about ten minutes, discussing with him his bank account and other matters. He expressed his opinion that there was "nothing wrong with his mind, he seemed perfectly clear in talking to me." M. G. Gunderson, cashier of the Coolidge & McClaine Bank, who had known Morley for "at least sixteen years" visited him at the hospital about two weeks before his death and conversed with him for five or ten minutes. It will be recalled that he was the individual whom Morley had nominated as executor in the aforementioned will, Gunderson testified that Morley recognized him at once and "he seemed to know what he was talking about when he was talking to me, he talked all right." In response to another question he replied. "Well, he was a sick man, of course, when I saw him at the hospital, but his questions were intelligent and such questions as you would expect from him." He expressed the opinion that his mental condition was sound. Mrs. Carrie Nelson, a general nurse employed at the hospital, who declared that she saw Morley every

day, testified that he showed improvement from the outset, that his speech gradually returned and, when asked if he was rational on November 16th, replied, "He certainly was—knew what he was about." Dr. Arthur W. Simmons, a veterinarian, who was an old acquaintance of Morley's, testified that in 1918 Morley declared that "he intended to leave his money to charity, perhaps that or the Red Cross." Mrs. Sarah Stewart, a special nurse, who attended upon Morley when he was confined in the hospital in June of 1925, testified that at that time she heard him tell another patient "he was going to leave his money where it would do the most good, he wasn't going to have anybody racing around in automobiles on his money." She swore that he improved rapidly after being brought to the hospital on November 1st, and that about the middle of that month "he would talk generally rational, he could ask for things he wanted and, so far as I would know about insanity, why, he talked like any ordinary person would." She added that he was mentally sound. About two weeks prior to Morley's death, according to Mrs. Stewart, "I went in one evening and he was chuckling, I said, 'What is the matter, Rome?' 'Well,' he said, 'the girls are mad as hops at me, Bill Jack and Denny McCleary are mad, too, I told them I had made out a new will and they didn't think I ought to leave it to the hospital'—that is the first he ever mentioned to me having left it to the hospital." According to Mrs. Stewart, Morley added that when his relatives learned of the contents of his will one of them wanted him "to move down with her" but that he proposed "to leave well enough alone" because he felt "that they just wanted him to go down so they could inherit his will." Mrs. Day, the aforementioned superintendent of the hospital, testified that

on November 1st when Morley was brought to her institution he was unconscious but that three or four days later he showed improvement and that ten days after his arrival his mind was fully restored. She swore that on November 16th "his mind was as clear then as it ever was" and that he was mentally sound. She testified that in June of 1925 he expressed the purpose of "leaving his property to some charitable institution rather than to his relatives" adding that "he said his relatives had never done anything for him." One G. D. Bowen, a farmer, who testified that he had known Morley "forever, I guess" told of an incident which he said had occurred in 1917 or 1918 wherein Morley expressed the purpose "to invest his money in bonds * * * and he said he intended to fix that so when he was through it would revert back to the government, and added he didn't want his relatives to have a cent of his money." Mrs. T. O. Thornton, who became Morley's special nurse on November 6th, described his condition on November 16th thus: "I thought he was very bright" and when asked whether he was sane, replied: "I certainly thought so." Ben McGinnis, who testified that he had known the decedent for twenty years, mentioned an occasion which he said had happened within the last three years wherein Morley, when asked what he proposed to do with his money, replied: "My folks don't need it." He testified that in the last week of November he visited Morley at the hospital, was at once recognized by him, and "I thought he was all right, I never thought or suspicioned there could be anything wrong with him."

The testimony reviewed above was amplified with details, dates, names of individuals, and with incidents relating to the various events mentioned above. Nothing developed upon the cross-examination of Ross,

Campbell, Gunderson, Eisenhart, Simmons or Bowen which in any way lessened the effect of their testimony. Quite to the contrary, Gunderson's testimony, and that of the other two bank officials, was greatly strengthened when, upon cross-examination, he testified that he declined to act as executor ''because I understood the Morleys didn't approve of it, I consider the Morleys my personal friends and friends of the institution, and I didn't wish to do anything that would in any way hurt our friendship or their regard for our institution.'' The cross-examination of Reynolds disclosed nothing more substantial than his inability to recall definitely the date of his conversation with Morley and his uncertainty whether the latter had ever previously overdrawn his bank account. The only circumstance developed upon the cross-examination of Dr. Keene affecting the weight of his testimony was the fact that he owned 150 shares of stock worth $5 each in the corporation entitled The Silverton Hospital. This institution, according to the testimony, was built as a community enterprise. Upon cross-examination Mrs. Stewart, Mrs. Thornton and Mrs. Day were asked numerous questions for the purpose of laying the foundation for subsequent impeachment. The credibility to be assigned to these witnesses is entirely dependent upon a comparison of their testimony, character, etc., with that of the witnesses who followed them.

In behalf of the contestants, thirty-five witnesses testified, twenty-five of whom were relatives of the deceased, five were medical witnesses whose testimony employed as a hypothesis a set of circumstances narrated by twenty-seven of the other witnesses; two were handwriting experts, and the remaining ones had no apparent interest in the controversy.

The twenty-five relatives and four lay witnesses described at length Morley's condition at the hospital and what occurred upon the occasions of their many visits. All, of course, did not call upon him at the same time. Some called shortly after his confinement in the hospital on November 1st, when all concede that he was irresponsive, and others called near the close of his life, when it is conceded that he again lapsed into unconsciousness. But for the most part the testimony of these twenty-nine witnesses concerns itself with the period of time from about November 15th to a week or ten days prior to Morley's death. According to their accounts Morley was scarcely more than a drivelling incompetent—he frequently failed to recognize his callers, whether they were his relatives or others; he had to be told to open his mouth when food was fed to him; he possessed various delusions; ofttimes misconceived facts; mistook the afternoon for the morning, etc. This mass of testimony extending over 300 typewritten pages is too lengthy for suitable quotation, and hence in order to furnish an understanding of its substance, we quote the following summary of it as compiled in respondent's brief:

"(1) Although Gerome was in the Silverton hospital and being cared for by Dr. Keene, he thought he was at Dr. Wrightman's home or hospital and that Dr. Wrightman was caring for him.

(2) He could not recognize old acquaintances or relatives who called on him at the hospital.

(3) When able to speak, he frequently asked about the health of persons who had been dead many years and whom he knew, when in his right mind, were dead.

(4) Although Gerome was never out of the hospital after he entered it November first until his death, he had regularly recurring hallucinations that he was able to go 'up town' and had done so from time to time after his last stroke.

(5) He entertained delusions as to how he was shaved while in the hospital.

(6) In December he had delusions that he had been out to a dance or a dinner during the time he was bedfast in the hospital.

(7) Gerome insisted that the hothouse flowers brought to him at the hospital the middle and latter part of November were picked along the railroad tracks at Monitor and along the Abiqua river.

(8) Gerome entertained delusions that he had fished from the hospital window and had picked apples in the hospital yard and suggested that others do so.

(9) He told repeatedly of killing a deer or an elk during the period he was in the hospital bedfast after his last stroke.

(10) During his last illness Gerome was almost continually under the delusion that his ears, eyebrows and throat were infected with flies, lice and maggots; he talked of this affliction to practically everyone who came to see him.

(11) Gerome also imagined that he had brass tacks in his feet and would ask those who came to see him if they were similarly afflicted.

(12) The last week in November he assured Charity Scott that a night or two earlier the valley had been aflame with fire; that men were killing snakes that hissed fire from their mouths.

(13) He insisted that during the time he was bedfast in the hospital he had bought a team of roan ponies.

(14) During his last illness he apparently had no true conception of time or season; thus about the middle of January he asked John Thurman, a friend living near Marquam, how he was getting along harvesting; and between two and four o'clock in the afternoon he asked his sister, Rose Whitlock, how she happened to be up so early in the morning.

(15) He adhered tenaciously to the wholly false and groundless notion that Bill Trollinger, a Silverton resident, had married a squaw.

(16) Similarly, about January 1st and at other times he falsely asserted to various persons who visited him that Myrtle Woolen, a Silverton woman, had had a baby and was upstairs in the hospital.''

■■ We are thus brought face to face with a conflict, if there be one, between the testimony offered by the contestants and that produced by the proponent. The important issue is the condition of Gerome Morley's mind November 16th when he attached his signature to the will. Evidence of his mental condition as revealed by his acts, conduct, habits and conversation, both before and after November 16th, is relevant only for the purpose of throwing light on the condition of his mind at the crucial moment: *Talbert v. Skilbred*, 125 Or. 545 (267 P. 396); *Estate of Allen*, 116 Or. 467 (241 P. 996); *Pickett's Will*, 49 Or. 127 (89 P. 377); *Carnagie v. Diven*, 31 Or. 366 (49 P. 891); *Chrisman v. Chrisman*, 16 Or. 127 (18 P. 6), and *Heirs of Clark v. Ellis*, 9 Or. 128. It is impossible to reconcile the testimony except upon the theory that Morley was rational on November 16th when he signed his signature to the will, and at other times had irrational intervals. We are satisfied, however, that the testimony does not warrant a belief that Morley was given over to all of the incompetent manifestations set forth in the above summary. In coming to this conclusion we subscribe to no belief that the members of the Morley family would consciously tell an untruth. We believe there are circumstances disclosed by the record which possibly have caused some of the members of the family to unwittingly distort the facts and err in their recollection. It is manifest that the family is convinced that the will is an unjust one. Possibly their opinion is not mistaken, and it may be that Gerome after having accepted from his sister, Mrs. McCleary, for twelve years

board, lodging, laundry and mending service for a meager remuneration only, should have inserted in his will a substantial bequest for her. Likewise, it may be that one more just than Gerome would have made provision for his poor relatives. His violation of the family's innate sense of justice has perhaps convinced the relatives that they are fighting a righteous battle so that justice may be done to the McClearys and to the Barkhurst children. Further, in weighing the testimony and appraising the credibility of the witnesses it seems proper to take into account the fact that some of the members of the family were apparently opposed to Dr. Keene and favored Dr. Wrightman. Likewise, we believe from occasional remarks which found their way into the record that some of the members of the family at least did not entertain a friendly feeling towards the Silverton Hospital. These and other circumstances of like kind make us feel that the testimony of some of the members of the Morley family may be affected by partisanship of a type which is peculiarly capable of distorting the truth.

Facts substantiated by disinterested witnesses overcome or lessen the effect of many material items of the contestant's testimony. For instance: (1) Morley, while in the hospital, had fallen into the habit, which he much deplored, of lying awake at night and sleeping in the daytime. Since his relatives generally called upon him in the afternoon it seems quite likely that at those times he was drowsy, listless, or possibly resented their presence. This circumstance possibly accounts for his failure to recognize some of his callers at once. (2) He was fond of applying nicknames, and called two of the nurses by names chosen by himself. This circumstance apparently caused some of his relatives to believe that he had mistaken the nurse for

someone else. (3) As we have previously mentioned, Morley had a sense of humor and was fond of joking. The fact that in answer to the inquiries of some of his callers concerning his progress he replied that he had visited the barber shop that morning may have been nothing more than an effort at humor. (4) He had a perverted taste, and this fact may account for his belief that the drink served to him by the hospital was strong coffee when it was nothing more than milk and hot water. (5) He had no love for flowers, and obviously knew (since his relatives sent L. J. Adams to interview him concerning his will) that his will was a disappointment to his relatives; these facts may account for his failure to appreciate their visits and the flowers brought to his bedside by them. (6) The hospital chart shows that Morley was served a piece of venison at about the time of his alleged declarations concerning a deer and an elk. This circumstance explains in a large measure some of the accounts concerning his statements upon those subjects. (7) The fact that he mistook afternoon for the morning was very likely the result of sleeping in the daytime and lying awake at night. And (8) there actually were apple trees laden with apples just outside of his window and others were upon the ground when he complained of the hospital's failure to serve him some.

The above observations strip some of the evidence supplied by the contestants of much of its force. We find it difficult, however, to account for Morley's alleged remarks about brass tacks in feet and his repeated assertions that he was afflicted with lice. We notice, however, that Dr. Keene and the attending nurses testified that Morley suffered pain from the contractures following his fourth stroke and that he experienced itching sensations which necessitated the

application of alcohol rubs. Possibly these facts together with the circumstance that he described to one of his nurses, an elaborate dream about a woman whose feet bled copiously from the brass tacks upon which she trod, may account for some of his talk.

In order to possess testamentary capacity it is essential that the individual comprehend the nature of the act in which he is engaged, that he know the kind and extent of his property, and is able to bring before his mind the persons who properly constitute the object of his bounty: *In re Phillips' Will,* 107 Or. 612 (213 P. 627), (contains an extensive collection of the authorities). The burden of proof is upon the proponent, but he has the benefit of the presumption that one who executes a will in due form is competent: *In re Will of Robert Carr,* 121 Or. 574 (256 P. 390); *Estate of Riggs,* 120 Or. 38 (241 P. 70, 250 P. 753). *Chrisman v. Chrisman,* 16 Or. 127 (18 P. 6); *Holman's Will,* 42 Or. 345 70 P. 908); and *Greenwood v. Cline,* 7 Or. 17. An insane delusion whether constant or recurrent which does not touch the subject matter of the will does not destroy the capacity to make one: Rood on Wills, (2d Ed.), section 135; Schouler on Wills, etc. (6th Ed.), section 136. The testimony of a subscribing witness who is alert mentally and who possesses an adequate opportunity for making needed observations is entitled to much weight: *In re Will of Robert Carr,* 121 Or. 574 (256 P. 390), (citing earlier cases). Likewise, the conclusion of the county judge, since he observed the witnesses as they testified, is a matter to which importance should be assigned: *In re Dale's Estate,* 92 Or. 57 (179 P. 274); *In re Darst's Will,* 34 Or. 58 (54 P. 947).

The application of these principles of law to the evidence seems to demand a decree in favor of the

proponent. The attesting witnesses had an adequate opportunity to determine whether Morley was sound mentally. Ross called at the decedent's bedside three different times. Campbell was there twice. The former is a lawyer of much experience and the latter is a business man who had handled many transactions for Morley. Ross had known the deceased since childhood, while Campbell's acquaintanceship with him covered several years. Concerning Ross respondents' brief says: "We concede to him the presumption of honesty and accuracy of a wholly disinterested witness. We credit him with endeavoring to narrate correctly the facts to which he testified." Alongside of this testimony should be placed that of Dr. Keene who returned to the hospital after his morning visit for the express purpose of answering Ross's inquiry whether Morley was competent to make a will. The foregoing principles also demand that Judge Hunt's opinion is entitled to much respect. He had a better opportunity than anyone else will ever again have to determine the truth. After a painstaking comparison of the testimony we have arrived at the conclusion that Gerome Morley possessed testamentary capacity on November 16, 1925.

Having arrived at the conclusion that Morley was not subject to many of the delusions and misconceptions of facts stated in the comprehensive hypothetical question propounded by the contestants, it follows that the opinion evidence of the experts must be disregarded.

 We have considered carefully contestants' charge that the will was the result of Mrs. Day's alleged undue influence upon Morley. Upon this issue the burden of proof rested with the contestants: *Rice v. Rice,* 95

Or. 559 (188 P. 181). We have carefully considered the testimony bearing upon this issue and find very little evidence in substantiation of this charge. Apparently Morley found at the hospital the friendly human touch which brightened the last days of his drab life. It is natural that under such circumstances one who had persistently refused to observe the kindly amenities of life by even occasional acts of generosity toward those about him, and who had consistenly suppressed every charitable impulse which would prompt him to contribute to a worthy cause, should eventually, as he saw life ebbing away, endeavor to make amends, tardy though they be, in the form revealed in Morley's will. It purposes to give something to charity and at the same time to make provision for his relatives in the event that illness overtakes them. It is our conclusion that this portion of the charges is without merit. We are also of the opinion that the will was properly executed.

The above being our views, the cause will be remanded to the circuit court with instructions to enter a decree in favor of the proponent. Costs and disbursements will be allowed to neither party.

BEAN, C. J., RAND and KELLY, JJ., concur.