Argued September 6; affirmed September 26, 1944

IN RE PROVOLT'S ESTATE
LETTIKEN ET AL. *v.* PROVOLT ET AL.
(151 P. (2d) 736)

Before BAILEY, Chief Justice, and BELT, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Niel R. Allen,* of Grants Pass (Niel R. Allen and Samuel M. Bowe, both of Grants Pass, on the brief), for appellants.

*George M. Roberts,* of Medford (V. A. C. Ahlf, of Grants Pass, and George M. Roberts, of Medford, on the brief), for respondents.

BELT, J.

Contestants appeal from a decree of the circuit court sustaining the validity of the will of E. U. Provolt, deceased. It was challenged on the grounds: (1) Lack of mental capacity and (2) undue influence alleged to have been exercised upon the testator by his sister, Effie Wichman. There are no questions of law involved. It is purely a question of fact.

E. U. Provolt, who was 76 years of age, died in the Josephine General Hospital at Grants Pass, Oregon, on June 29, 1942, leaving an estate of the appraised value of approximately $26,000. The will was executed on May 15, 1942, and, omitting formal parts, provided: (1) That Lawrence Eades, Angia Clayton, Herbert Eades, Chester Eades and Glenn Eades were bequeathed $100.00 each; (2) that his sister, Angia

Lettiken, was to receive $50.00; (3) that Glenn Provolt and Elva Stone were each given twenty-five per cent of the property remaining after bequests Nos. 1 and 2 were paid; and (4) that his sister, Effie Wickman, was to receive the remaining fifty per cent of the balance of his estate. Testator never married and there are no lineal descendants. The contest is between his nieces and nephews and his sisters Angia Lettiken and Effie Wichman. It is not an unnatural will. The chief beneficiary is Effie Wichman, his sister, who aided materially in caring for him during his extended illness. There is absolutely no evidence tending to show that she exercised undue influence over her brother in causing him to make the will. We eliminate that issue from the case.

The close question is whether testator had sufficient mental capacity on May 15, 1942, to make a will. Did he understand the transaction in which he was engaged? Did he know how he wanted to dispose of his property? Did he understand and appreciate who were the natural objects of his bounty?

Testator for several years had been afflicted with diabetes and, by reason thereof, had been confined in the hospital at various times. It was while in the hospital in October, 1941, that testator caused a temporary guardian to be appointed—Sam Lettiken, husband of his sister Angia—to care for his property. Testator was an experienced farmer and, during the course of the years, had accumulated considerable property. This appointment marked the beginning of strife and contention among the various relatives who, no doubt, were hoping that they would be the beneficiaries of this bachelor's estate. Effie Wichman thereafter petitioned that she and Glenn Provolt be appointed guard-

ians. The county court, however, after hearing re-appointed Sam Lettiken and this appointment continued during the life of the testator. Death terminated the guardianship.

■ The appointment of a guardian creates a presumption of mental incapacity to make a will, but it is a disputable presumption which may be overcome by evidence to the contrary: *Clark v. Clark,* 125 Or. 333, 267 P. 534; *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192; *Ames v. Ames,* 40 Or. 495, 67 P. 737.

Testator was undoubtedly a very sick man at the time the will was executed and was suffering from senile dementia in an advanced stage. We are convinced that, at times, he was wholly incapable of making a will as he did not even know his close friends or those who were near and dear to him. Notwithstanding this mental affliction of a progressive nature, the vital question is whether it had reached such a stage that testator was incapable of experiencing a lucid interval. In other words, we must determine the difficult question as to whether, in this particular case, senile dementia had progressed to such a degree as to preclude mental capacity to make a will. In Page on Wills (Lifetime Ed.) § 138, referring to senile dementia, it is said:

"* * * It is one of the most difficult of the many difficult questions of mental capacity; not because the law on the question is doubtful, but because it is so difficult to determine the point in its progress at which the faculties are so far impaired that they fall below the standard of legal capacity."

■ We cannot agree with appellants that, because testator was suffering from senile dementia in an advanced stage at the time of executing the will, it

is conclusively shown that he was incapable of a lucid interval and, therefore, testamentary capacity had ceased to exist. The mere presence of such mental affliction does not necessarily establish legal inability thus to dispose of property. As stated in 68 C. J. 442, Wills § 39:

> "Senile dementia, often a result from old age, does not necessarily result in mental incapacity to make a will, but there must be such a failure of the mind as will deprive the testator of intelligent action. The disease is progressive in nature, and it must be determined whether its progress has so impaired the faculties of the testator that they fall below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effect in the particular case."

To the same effect, also see Herzog on Medical Jurisprudence, § 700, citing, among other cases in support of the text, *Clark v. Clark* (Or.) supra.

▮▮▮ No doubt in some cases the evidence would show that senile dementia had so impaired the mental faculties that there could be no reasonable deduction of ability to execute a will; whereas, in others, the effect of such mental disease upon the mind would not be so pronounced. It is extremely difficult to determine just at what stage in the progress of senile dementia the mind is incapable of functioning intelligently; *Byrne v. Fulkerson*, 254 Mo. 97, 162 S. W. 171; *In re Bose's Estate*, 136 Neb. 156, 285 N. W. 319. The line of demarcation between sanity and insanity is often as indistinct and uncertain as that between twilight and darkness. It is a question upon which medical experts have often disagreed. After all, regardless of mental or physical infirmities, the important

thing to determine is whether, at the time of the execution of the will, testator understood the business in which he was engaged and knew how he wanted to dispose of his property. A high degree of mentality is not required in order that a testator may know generally the value and extent of his property, the natural objects of his bounty, and what disposition of his property he desires to make. A will is valid if mental capacity exists at the time of the execution thereof, notwithstanding the dementia of the testator before and after execution. Evidence relative to the mental condition of testator before and after the execution of the will is admissible to determine his mental status at the time of its execution.

In the light of the above well-established legal principles we shall consider the evidence. The will was executed while testator was confined in the Stansfield Nursing Home at Grants Pass, Oregon, in the presence of attesting witnesses—Laura Barton, a nurse, and Ethel E. Stansfield who owned and operated the nursing home; Sherman Smith, an attorney who drafted the will; and J. E. Daniels, an old time neighbor and friend of the testator.

Mr. Daniels had been a friend of testator for more than 20 years and had often visited him in the hospital and nursing home. This witness testified that, on the day in question, testator discussed with him the disposition of his property and requested that he procure an attorney to prepare the will. Daniels made notes from what testator told him as to the names of the various beneficiaries and how he wanted to dispose of his property. This information was transmitted by Daniels to Mr. Smith, an experienced and reputable lawyer, who prepared the will at his office and then took it to the nursing home for execution.

Daniels testified that Smith read the will to testator and explained each paragraph to him, whereupon testator said that "was the way he wanted it" and signed the will. Daniels was firm in the opinion that testator knew what he was doing and that his mind was clear.

Mrs. Stansfield was positive in her testimony that testator was "in full possession of his faculties at that time", and that he knew what he was doing. She also testified that Mr. Smith read the will to testator and that the latter said that was the way he wanted it. The other attesting witness did not testify as she was not available.

The testimony of Mr. Smith is convincing, although he was mistaken in saying that Mrs. Stansfield also read the will to the testator. Smith knew something of the background of the case and the strife and contention that had arisen between relatives over this estate so he was extremely careful about the execution of the will. Smith is positive that testator knew exactly what he was doing and had sufficient mental capacity to act intelligently in thus disposing of his property.

Dr. C. L. Ogle, who took over the case from Dr. R. G. Wilbur when the latter enlisted in the armed service of his country, attended testator professionally from May 3, 1942, until his death about two months later. He testified that his patient's mental condition "was normal so far as I could see" and that, in his opinion, when he visited him on May 12, 1942, he then had mental capacity to make a will. Dr. Ogle also called upon testator on May 19, 1942, four days after the will was executed.

Dr. Wilbur supports the contention of contestants that testator did not have mental capacity to make a

will. Dr. Wilbur had been Provolt's physician for several years previous to about the middle of April, 1942. It was his positive opinion that Provolt, when he last attended him and for some time prior thereto, was suffering from senile dementia in an advanced stage and was mentally incompetent to transact business of any nature. It was his opinion that, in view of the progressive nature of Provolt's mental affliction, probably this condition gradually became worse. Dr. Wilbur testified that there were many times when his patient did not even know who he, Dr. Wilbur, was. He did admit, however, on cross examination, that there were times when he finished treating him on April 10, 1942, that testator had "semi-lucid intervals" and that "he would have times when you could talk to him with some sense to it and at other times you would talk to him without any rational answers whatsoever."

There is much evidence from other witnesses tending to show that, before and subsequent to the time of the execution of the will, testator's conduct indicated mental incompetency. We think, however, that such evidence was overcome by that offered by proponents concerning testator's mental condition at the time the will was executed.

■ The trial court had the advantage of seeing and hearing the witnesses. Its findings are strongly persuasive, especially in cases of this character.

■ We have carefully examined the record and have been aided by able briefs of counsel. We conclude that proponents have established by the greater weight of the evidence, that testator's will is valid.

The decree is affirmed. Neither party will recover costs or disbursements.