Argued October 9; affirmed November 6, 1945

# In re Walther's Estate
## Zenger et al. v. Wyss
(163 P. (2d) 285)

Before Belt, Chief Justice, and Rossman, Kelly, Bailey, Lusk and Hay, Associate Justices.

*Nicholas Jaureguy*, of Portland (Cake, Jaureguy & Tooze, of Portland, on the brief), for appellants.

*George P. Winslow*, of Tillamook, for respondent.

HAY, J.

About the beginning of the present century, Otto Walther and his wife Margret established a home upon a tract of 160 acres of logged-over land in Tillamook County, Oregon, which they developed into a dairy farm. There they spent the remainder of their lives. They became well-known and respected members of the Tillamook community. Having no children of their own, they took into their home (probably in the year 1905) the respondent, Ulrich Wyss, who was then about seven years old, and had been bereaved of both parents. He lived with them until he was about fourteen, when he ran away and was absent about seven years. At the age of twenty-one he returned, and worked for the Walthers as hired man until Mr. Walther's death in 1929. Thereafter, until Mrs. Walther's death, he operated the farm under an arrangement whereby Mrs. Walther and he shared the profits equally. He gave his whole time to the business and his efforts resulted in a considerable improvement of the farm. He never married. He habitually spent his leisure time at home,

and his relationship with Mrs. Walther, who was some thirty-five years his senior, was almost filial.

In 1931, Mrs. Walther made a will, by which she devised and bequeathed the farm, with the livestock and other farm personalty, worth about $12,000, to Wyss, but subject to the charge of a specific bequest of $2,000 to Johanna Zenger, one of her nieces and a contestant herein. The residue of her estate, of the value of over $6,000, she bequeathed, in equal shares, to her brother, Henry Thoeny, and her sisters, Katherina Zenger and Amalie Walther.

On July 7, 1942, Mrs. Walther suffered some sort of cerebral injury, referred to by the lay witnesses as a "stroke". She was removed from her home to Tillamook General Hospital, where she was confined for some two weeks. Thereafter, she was returned to her home, stayed there five days, and was again received into the hospital, remaining there one week. Arrangements were then made whereby she was placed in the care of Mrs. Rose Jacobs, a sister of Ulrich Wyss, who took Mrs. Walther into her home, where Mrs. Walther stayed until her death on March 3, 1943, at the age of eighty-one years. Mrs. Jacobs was paid for her services.

On August 26, 1942, at Mrs. Jacobs' home, Mrs. Walther executed the will which is the subject of the present litigation. Under this will, Ulrich Wyss became the sole beneficiary. In the time intervening between the making of the two wills, the residuary legatees under the 1931 will died. The 1942 will was admitted to probate in common form on March 26, 1943, and thereafter these contest proceedings were instituted. The contestants are children of one or other of the residuary legatees under the former will. The grounds of

contest alleged are (1) mental incompetency of the testatrix, and (2) undue influence exerted over her by the beneficiary, Ulrich Wyss. After a hearing, the circuit court disallowed the contest, and contestants have appealed.

■■ Every person of twenty-one years of age and upward, of sound mind, is permitted by law to dispose of his property by will, with certain restrictions not applicable to the present case. Section 18-101, O. C. L. A., as amended by chapter 136, Oregon Laws 1941. The requirements of sound-mindedness or mental competency in this connection have been stated frequently by this court. The testator must be able to understand the nature of the act in which he is engaged, the kind and extent of his property, and the claims of those who are the natural objects of his bounty. *In re Dougan's Estate,* 152 Or. 235, 53 P. (2d) 511; *Clark v. Clark,* 125 Or. 333, 267 P. 534; *In re Phillips' Will,* 107 Or. 612, 213 P. 627. His mind should apprehend, without prompting, who are the natural objects of his bounty. *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192, 180 P. 595. See also *Mason v. Bowen,* 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713; *Kleinlein v. Krauss,* (Mo.) 209 S. W. 933; *In re Heaton's Will,* 224 N. Y. 22, 120 N. E. 83; *In re Latto's Estate,* 129 Minn. 248, 152 N. W. 541.

The evidence established clearly the fact that two of the contestants, Johanna Zenger and Caroline Brande, had maintained cordial relationships with Mrs. Walther over a period of many years. Miss Zenger, particularly, was very friendly with her aunt, visited her frequently, and was undoubtedly her favorite relative. Mrs. Walther gave instructions that, in case she became ill, Miss Zenger should be called immediately,

and, when she was stricken, this was done. Miss Zenger, who resided and was employed in Portland, thereupon procured leave of absence from her employer, and went immediately to Tillamook, where she remained constantly with Mrs. Walther until about ten days after her removal to the Jacobs home. Thereafter, she visited Mrs. Walther not less than once every fortnight.

During the first two weeks of her confinement in the hospital, Mrs. Walther was, for the most part, in a state of mental confusion. There were periods, however, when she appeared to be rational. After she was removed to her home, Miss Zenger testified that Mrs. Walther continued to talk about going home. Some of the lay witnesses testified that she suffered from hallucinations. For example, she imagined at times she was on the floor and was unable to get up; that people were throwing dead fish into her yard, and that she was surrounded by dead fish; that people were tearing down her house, and that some one had taken her cookstove. While in the Jacobs home, according to the witnesses for the contestants, Mrs. Walther continued to have these hallucinations. Sometimes she failed to recognize friends when they came to call on her and occasionally she even failed to recognize Miss Zenger and Mrs. Brande. Miss Zenger said that she threatened to throw herself out of bed whenever her wants were not attended to immediately, and that once or twice she did so.

While Mrs. Walther was being cared for in the hospital, she was given hypodermic injections of small doses of morphine occasionally to alleviate pain and as a soporific. The morphine no doubt had some effect upon her mental alertness, but, after she was taken to Mrs. Jacobs' home, very little morphine was admin-

istered. It is evident that her illness affected her mentality to some extent, although she appears to have had intervals of rationality.

■ The precise question before us, of course, is whether or not, when she executed the will, the testatrix had testamentary capacity. She was not required to have had a high degree of mentality. *Lettiken v. Provolt,* 175 Or. 128, 151 P. (2d) 736. For example, one may have testamentary capacity even if mentally incompetent to execute contracts, deeds or other bilateral engagements. *In re Sturtevant's Estate,* supra (92 Or. 269, 178 P. 192, 180 P. 595); *Gilliam v. Schoen,* 176 Or. 356, 157 P. (2d) 682; *In re Latto's Estate,* supra (129 Minn. 248, 152 N. W. 541). If the testatrix sufficiently comprehended the nature of the business in which she was engaged, her testamentary capacity was not necessarily impaired merely by reason of her old age, debility and sickness. *McGreal v. Culhane,* 172 Or. 337, 141 P. (2d) 828; *In re Robert Carr's Will,* 121 Or. 574, 256 P. 390; *In re Phillips' Will,* supra (107 Or. 612, 213 P. 627); *Lettiken v. Provolt,* supra (175 Or. 128, 151 P. (2d) 736); *Clark v. Clark,* supra (125 Or. 333, 267 P. 534).

Sometime after she became ill, Mrs. Walther told Miss Zenger that she had made a will and that she "wanted to make it more clear". Miss Zenger discussed the matter with Mr. E. J. Claussen, an attorney in Tillamook who attended to most of Mrs. Walther's legal business, and asked him to be prepared to go to Mrs. Jacobs' home if and when called. On August 26, 1942, Mrs. Walther sent for Mr. W. J. Riechers, her banker, who had been named as executor under her former will and who had that instrument in his custody. He was a very old friend of hers, and had been ac-

quainted with her since 1913. They frequently conversed together in German, and the fact that Mr. Riechers was able to speak in that language established a tie between them. Mr. Riechers went to the Jacobs home and had a conference with Mrs. Walther. We quote the following from his testimony:

"Q. What took place when you went out there alone the first time? A. I went in the room where she was, I talked with her, I told her she ought to brace up and eat more, she would get to feeling better —kind of joshing her a little. She said she didn't think she wanted to eat anything; I asked her how she could go for some nice fresh trout, told her I had some nice trout, I would bring her some fish. No, she said she didn't think she could eat any fish. She told me then—I talked with her for some little time, she said she had been terribly sick, she told me she would like to have her will changed and would like to have me bring out the will that was there at the bank, and Mr. Claussen, so that—well, she didn't say 'Mr. Claussen', but I asked her if she wanted Mr. Claussen, she said 'Yes, bring Mr. Claussen along', she wanted to make a new will. Q. Did you discuss the details of the changes at that time with her? Do you recall? A. I don't think we did. Q. Now, right there, Mr. Riechers, knowing her as you did, did you notice anything wrong with her mentally there that first time when you see her? A. I think she knew what she was talking about, it seemed so to me. Q. Did she have any difficulty in any way physically? A. Well, her voice was husky, but she always did have a little difficulty in speaking, she always was hard to understand, but I could understand her all right, but she told me definitely what she wanted to say; I asked her a time or two, I says 'You want to make a new will so you will have to have an attorney?' She knew Mr. Claussen, I knew that, so I asked her if she wanted Mr. Claussen, she said 'Yes', so I went back to town, after

lunch brought Mr. Claussen out. Q. Now, what took place when you went out with Mr. Claussen? A. Well, I had the will with me that she had had on file at the bank; I gave it to Mr. Claussen. I told her he better go in and talk with her; I didn't go in. Q. You stayed outside? A. I stayed in the car. Q. Then did you go in later? A. Yes, I went in later. Q. Just tell the court what took place? A. Mr. Claussen came out to get his typewriter, so I said 'Well, I will go in and talk with Mrs. Walther while you are writing up the new will'. He said she wanted to make a new will, and I did talk with her a little while; I don't know of anything particular that was talked about excepting that we hoped she would soon be better, and the like of that. Q. What took place then? A. Mr. Claussen brought in the new will that he prepared and read it to Mrs. Walther. She said that was satisfactory, as I remember it, and before I signed as a witness I asked her again definitely, I says 'Mrs. Walther, you understand what this is? This is a new will; you are canceling your old will, and that according to the new will Ulrich is to have everything'. She said 'That is right; that is the way I want it'. Q. You are sure— A. (Interrupting) She called me by name and told me 'Yes,' that is what she wanted. Q. Then she signed it, did she? A. Yes, she did. Q. You and Mr. Claussen completed it in her presence? A. That is right."

The witness stated further that Mrs. Walther's conversation was coherent and that he thought she knew what she was doing.

"A. On account of her being ill and all, that was the very reason I asked her definitely 'Now, Mrs. Walther, you know everything that is going on here; you understand that you are canceling your old will and making a new will that leaves everything to Ulrich?' I think that is pretty close to the words I used. She says 'I understand, Mr. Riechers'— she always called me 'Mr. Riechers'. I said 'If that is what you want, that is what this new will is, if

you want it that way, it is already (sic) for you to sign'. Q. You felt then she clearly understood what it was and was capable of taking care of that kind of business? A. I wanted to be sure myself; I wanted to be sure that she knew what she was doing under those conditions.''

Mr. Claussen had been well acquainted with Mrs. Walther since 1929. He testified that on the 28th and 29th of July, 1942, Miss Zenger conferred with him with reference to Mrs. Walther's will. On the first occasion, she wanted to know whether Mr. Claussen ''knew of a will'', and, on the second, she said that she knew that there was one, but that Mrs. Walther had in mind making some changes. She asked him to be in readiness to go to the hospital ''in case they thought Mrs. Walther were able to execute a will''. On August 26th, he went with Mr. Riechers, at the latter's request, to the Jacobs home, taking with him a typewriter and a blank form of will. He testified in part as follows:

''A. On that noon I went into the room, I spoke to Mrs. Walther I understood she wanted to consider changing her will, she said she did. Q. Where was Mrs. Walther when you went in there, was she in bed? A. No, she was sitting in a chair, it was rather a large chair, wheelchair or something similar to it. I think—I don't want to say too definitely, but I suggested that perhaps we had better go over the old will first. * * * A. I asked her whether she would like to go over this will first, she said she would, so I read it to her very slowly, then asked her about these various items and whether she wanted to leave the two thousand to Miss Zenger, she said 'No'; then I mentioned these three names here and she said 'No, nothing to them', she wanted to leave everything to Ulrich; she did want this provision for the monument or headstone at the grave as was written in the old will. I asked her whom she wanted as executor—I probably had to explain that some,

who was to take care of it after she died, she said she wanted Ulrich to do that, so I went to the car and got my typewriter and the other form of will—I think at that time Mr. Riechers went into the home. I went into the dining room adjoining the room where she was, put the typewriter on the dining room table and prepared a new will. When that was done I went back in there and read that new will to her. I may be a little bit confused about the time of when some of these papers were made, but at one time I asked her, or rather called her attention to the fact that under the new will none of these folks would receive anything. I said 'this means that Ulrich will get your funds in the bank, your stock and the farm'. She hesitated a moment and said 'That is something to think about', then she said 'I know who stood by me all these years', and then I said something about Miss Zenger gets nothing under this will—Miss Zenger is the only one of these relatives that I had ever met, I said 'Is there some reason?' She said 'That is something I don't want to talk about'. I didn't ask her any further questions, and after I had read that will to her she signed it. I asked her if it would be satisfactory if Mr. Riechers and I would act as witnesses, she said it would—she signed it and Mr. Riechers, as I recall, before he signed it, he asked her if this is what she wanted, she said it was, then he signed it. Q. Did Mrs. Walther sign it in presence of both you and Mr. Riechers? A. Yes, both were very close to her and she could see us and we could see her. Q. Now, Mr. Claussen, just generally, just briefly first, what was her mental condition at the time she signed this will as compared with her normal condition? A. Why, she seemed to know what she was about all the time I was there, there wasn't much difference in the mental condition that I could see, her voice was way up, the register was higher considerable than it was normally, but she seemed to understand what I said, she answered without any hesitancy, I had no reason to believe

that she didn't understand what was going on. Q. And knowing her as you did before, would you say that she was normal mentally at that time, considering her age and everything? A. I would say I thought she was. Q. Was there any difference in her condition than it was Sunday night previously when you visited there, that you noticed? A. No, on Sunday evening her mind seemed quite clear, we spoke some of the picnic we had attended. Q. Who accompanied you there on Sunday evening? A. My wife was with me, she spoke of the fact that she would like to be home, I mentioned they could get a beautiful view from the windows of cows grazing in the pasture, she said she liked that. There was just one incident happened, and that was when we were ready to go, I went to her and took her hand, she said 'Goodby forever'. I said 'No, we will be seeing you again'. Q. That was Sunday evening? A. Yes, that was Sunday evening. Q. Would you say there was anything about her mental condition that seemed affected on the two visits, the Sunday evening prior to the execution of the will and the date of the execution of the will? A. There was nothing that I could see on Sunday evening; and we spoke about the need of writing checks, and she agreed with it and signed her name willingly."

Dr. H. J. Brown, the physician who attended Mrs. Walther while she was confined in the hospital, testified by deposition, he having been, at the time of the hearing, on active service with the United States Navy. In response to a specific question as to Mrs. Walther's mental condition while she was under his care, he stated:

"At times, Mrs. Walther was normal mentally, even though she had medication to stop pain or to help her sleep. In other words she would be normal mentally regardless of her physical condition or medication."

Although the language is somewhat ambiguous, we gather that, in the doctor's opinion, Mrs. Walther was mentally normal, although at times under the influence of opiates. This is indicated by his further statement that there was nothing about her condition which would have prevented her from being absolutely normal mentally on August 26, 1942, the date when the will was signed.

Mrs. Nellie Woodruff, a practical nurse with sixteen years' experience in nursing, including four years' experience in mental cases at the Oregon State Hospital, helped care for Mrs. Walther at the Jacobs home from August 15 to August 22, 1942. She testified that Mrs. Walther was not at any time during that period mentally deficient or unbalanced in any way, but, on the contrary, "was normal enough considering her age and her illness". The effect of her testimony was somewhat modified by her statement:

"I figure if she knows when she is hungry or thirsty or when she wants to be turned over or set up or lie down that is an indication that their mind is clear enough that they know what they want."

She said further, however, that Mrs. Walther asked many times for Ulrich Wyss, wanted to see him when he came, and acted as if she was very, very fond of him.

Mrs. Edna Claussen, wife of Mr. E. J. Claussen, is employed in her husband's office. She testified that she had been acquainted with Mrs. Walther for many years, and that she saw her on August 23, 1942, at the Jacobs home. She said:

"A. She was sitting up when we arrived there; we had 'phoned Mrs. Jacobs before we went out to ask her if she was able to receive callers. She had a very strong handclasp—we remarked about that.

Her left hand, I believe was paralyzed, at least it was limp in our hand and swollen and discolored. I thought she was quite talkative that evening, and very rational. Q. Very rational? A. Yes. Q. And knowing her as you did prior to her illness, did you notice anything about her condition that indicated she might be affected mentally in any way? A. No, I didn't notice anything of that kind. As I say, her voice was high-pitched, and it was rather an uncanny voice, but her mind seemed clear. Q. Nothing about her mind that brought forth to you from her talks that indicated to you there was anything the matter with her mind? A. She didn't indicate it.''

In addition to the foregoing, we have the testimony of Mrs. Rose Jacobs, Ulrich Wyss's sister, who had been acquainted with Mrs. Walther since 1904 or 1905. She testified, among other things, that, when Mrs. Walther first came to her home, she was very sick and they expected her to die, but that instead her condition improved. She was at first confused as to her whereabouts, and it was quite a while before she knew that she was not at home. Later on she was confused on awaking from sleep, but the rest of the time she talked normally. The witness spent hours and hours visiting with Mrs. Walther. She used to help her walk around the room, and sometimes Mrs. Walther would sing in German. On one occasion, she sang a Swiss war song, and remembered every word of it.

> ''Well, we were walking around the room, that is what we were doing, she pretended we were two soldiers, that we were marching, and she sung 'This is my country'—I can't say it in English—'Comrade', she says, we were supposed to be 'then a bullet came and shot his pal away from his side, and there he lay by his feet.' Q. How did she sing it, in German? A. She sang it in German, yes. Q. You talk German yourself? A. Yes.''

Mrs. Jacobs was present when the will was executed. She said that Mrs. Walther often talked about Ulrich Wyss, and once said:

"He is better to me than a son could ever be; he has been with me and he has never crossed me in any way at all."

It was Mrs. Jacobs who, at Mrs. Walther's request, sent for Mr. Riechers to come to see her, and, in that connection, she testified:

"* * * she wanted to see Mr. Riechers, too, that day in particular, she just insisted that I send for Mr. Riechers; I didn't want to, because that is the only time I had ever asked Mrs. Walther any questions about her business. I says 'Why do you want Mr. Riechers?' I said. 'I want them to change a will'. I says 'You are a broad-minded lady, I am sure you got everything fixed all right'. She says 'Well, I don't want those girls to make trouble for Ulrich; I want to change that will', so I called him then."

She testified that on another occasion Mrs. Walther said to her, referring to her nieces, "I have done enough for them; I don't owe them anything".

■■ The law lays upon those who claim that an insane person executed a will during a lucid interval of sanity the burden of establishing the asserted fact. *In re Faling Will,* 105 Or. 365, 208 P. 715; *Snyder v. De Remer,* 143 Or. 414, 22 P. (2d) 877. We are of the opinion, however, that the evidence in this case does not indicate that Mrs. Walther was insane, but rather that she was sane, although her mind was, from time to time, affected by her bodily illness. It appears that her mental condition continued to improve. Even some of the witnesses for contestants testified that her mind began to clear in the fall of 1942, and was normal in December, 1942, and January, 1943.

■ Contestants put forward the well-established principle of law that, where a will is unnatural in its terms and favors one who occupied a relationship of special confidence to the testator, slight evidence of undue influence is sufficient to invalidate it. *Greenwood v. Cline,* 7 Or. 17; *Holman's Will,* 42 Or. 345, 70 P. 908; *Turner's Will,* 51 Or. 1, 93 P. 461; *In re Diggins' Estate,* 76 Or. 341, 149 P. 73; *In re Dale's Estate,* 92 Or. 57, 179 P. 274; *In re DeHaas' Will,* 135 Or. 392, 296 P. 42. It is true that contestants were of Mrs. Walther's next of kin, and, as such, were natural objects of her bounty, within the usual definition of such term. *Page v. Phelps,* 108 Conn. 572, 143 A. 890. It cannot be said, however, that the will was unnatural merely because it preferred Ulrich Wyss to them. In view of the close and affectionate relationship which had existed for many years between the testatrix and Mr. Wyss, we think that her selection of him as her sole beneficiary was normal and natural. See, for example, *In re Phillips' Will,* 107 Or. 612, 213 P. 627, wherein the testatrix, ignoring the claims of her near relations, disposed of her property by will in favor of a church and other charities. This court held that, under the circumstances of the case, there was nothing strange or unnatural in such disposition.

Mrs. Jacobs testified, as has been stated, that Mrs. Walther told her that she had done enough for her nieces and did not owe them anything. Mr. Wyss testified that Mrs. Walther said, before her illness, that she had helped her relatives enough. There is no direct evidence, however, that she had actually aided these ladies financially, and both Miss Zenger and Mrs. Brande denied that she had done so. At another time, it is true, Miss Zenger testified that Mrs. Walther had given her money time and again, but we gather that

she was referring to gifts of insubstantial sums. While Mrs. Walther was at the Jacobs home, about the middle of August, 1942, Miss Zenger and Mrs. Brande decided that her care was too great a burden for Mrs. Jacobs. They felt that it was their responsibility, and, without consulting Mrs. Walther, they determined to remove her to Mrs. Brande's home in Portland, where, they felt, they could give her better care, and where necessary medical attention might be more easily procured. Mrs. Walther, on being told of this plan by Mrs. Jacobs, became very angry. She was passionately attached to her own home, and, throughout her illness, her principal desire seems to have been to return to it. Apparently the thought of being taken to Portland aroused her antagonism and suspicion, and she immediately accused Mrs. Brande of being "one of this clique that is trying to get my money." She was "almost in a frenzy", Miss Zenger said, at the idea of being taken to Portland, and acted as if Miss Zenger and Mrs. Brande were "doing something mean to her" by suggesting such a course. They suggest that the antagonism thus aroused caused Mrs. Walther, unjustly, to feel that they had turned against her, and that, motivated by such delusion, she executed the disputed will, whereas, but for the delusion, she would not have done so. They contend that a will executed under such circumstances is invalid, citing in support of such contention *In re Stephenson's Estate,* 132 Or. 234, 285 P. 224; *Taylor v. McClintock,* 87 Ark. 243, 112 S. W. 405; *In re Russell's Estate,* 189 Cal. 759, 210 P. 249; *Erickson v. Lundgren* (Mo.) 37 S. W. (2d) 629; and *In re Knutson's Estate,* 201 Wis. 526, 230 N. W. 617.

Insane delusions, which do not touch the subject-matter of a will, are held not to affect the testa-

mentary capacity of the testator. *Morley v. Silverton Hospital,* 138 Or. 75, 5 P. (2d) 92; *In re Murray's Estate,* 173 Or. 209, 144 P. (2d) 1016; *In re Sturtevant's Estate,* supra (92 Or. 269, 178 P. 192, 180 P. 595). This court has defined insane delusions, in this connection, as follows:

> "Conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. The mind that is so disordered imagines something to exist or imputes the existence of an offense which no rational person would believe to exist or to have been committed, without some kind of evidence to support it." *In re Sturtevant's Estate,* supra.

See also *Potter v. Jones,* 20 Or. 239, 25 P. 769, 12 L. R. A. 161. In the case of *In re Cline's Will,* 24 Or. 175, 33 P. 542, 41 Am. St. Rep. 851, a testator, by reason of the fact that his children had testified against him and in favor of their mother in a divorce suit, conceived the idea that they did not respect him and were trying to rob him of his property, and so disinherited them. The court held that the facts and circumstances were "sufficient to support the conclusion he reached, and to establish the belief he possessed", and hence that such belief could not be regarded as an insane delusion. In *In re Sturtevant's Estate,* supra, a father placed his business in the hands of his son, under whose management it declined. This fact, coupled with claims of debtors of the business that they had paid money to the son for which they had not received credit, and other suspicious circumstances, caused the father to feel that the son had embezzled his money. This court said that the father's judgment in the premises might have been too harsh, but that it was not based upon a

400

delusion, for there was some evidence to sustain it. We said, in part:

"On this branch of the case it is not for us to say whether in fact the son embezzled the money, but we must say from the record that there is evidence sufficient on that subject, which, presented to the mind of his father, would be a basis upon which the latter could render a judgment—without having a delusion imputed to him—although his decision might in our estimation be a harsh one."

In *Stevens v. Myers,* 62 Or. 372, 121 P. 434, 126 P. 29, speaking of insane delusions, Mr. Justice BURNETT said:

" * * * a delusion is the spontaneous product of the subjective processes of a disordered intellect, inducing a belief without any support in extrinsic evidence. On the other hand, if the element of spontaniety is not present, and there be any extraneous reason, however slight, inducing the conviction in question, and to which a deliberative mind would give attention, there is no delusion. A mere error in judgment upon proven or admitted facts does not constitute a delusion, however much it may be at variance with the conclusion reached by unprejudiced minds from the same facts."

■ It is our opinion, from the evidence, that Mrs. Walther's suspicions of Miss Zenger and Mrs. Brande were unjust, and that the feeling that they had turned against her and were after her money was a delusion indeed. However, we feel that the delusion cannot be said to have sprung up spontaneously in her mind without extrinsic evidence to support it. At most, it was an erroneous conclusion based upon a misinterpretation of the facts. It was not so extravagant, however, as to indicate that it was the product of a deranged mind.

■ On February 25, 1943, only six days before her death, Mrs. Walther wrote a letter to Miss Zenger,

couched in cordial terms, and indicating that she was still well disposed toward her. It is far from being certain, however, that Mrs. Walther made Wyss her sole beneficiary merely because she entertained a suspicion that Mrs. Brande and Miss Zenger (or Mrs. Brande alone) were "after her money". Her almost maternal feelings toward Wyss may have operated to cause her to prefer him over her kindred in any event, and, if of sound mind, she had a right to leave him all her property without regard to their expectations or deserts. *In re Phillips' Will,* supra (107 Or. 612, 213 P. 627).

As to the testatrix's mental competency at the time of executing the will, the testimony of the subscribing witnesses, aided by the presumption of sanity which follows proof of due execution, is entitled to great weight. *Morley v. Silverton Hospital,* supra (138 Or. 75, 5 P. (2d) 92); *In re Robert Carr's Will,* supra (121 Or. 574, 256 P. 390); *McGreal v. Culhane,* supra (172 Or. 337, 141 P. (2d) 828); *In re Sturtevant's Estate,* supra (92 Or. 269, 178 P. 192, 180 P. 595); *Clark v. Clark,* supra (125 Or. 333, 267 P. 534). The high standing of these witnesses in the community, their disinterestedness, their long acquaintance with the testatrix, and the manner in which their testimony circumstantiated the actions, appearance and conversation of the testatrix in relation to the drafting and execution of the will, established her mental competency almost beyond any reasonable doubt. *In re Sturtevant's Estate,* supra; *McGreal v. Culhane,* supra.

So far as undue influence on the part of Mr. Wyss is concerned, there was no evidence thereof whatever. He manifested no activity in bringing about the execution of the will, and was in fact unaware that a new

will was in contemplation. By mere chance he called upon Mrs. Walther on the day that the will was signed, and was present when Mr. Claussen was discussing its terms with her, but "never said a word". Mrs. Walther on that occasion asked him if he would "take the place", which so affected him that he wept. He testified:

> "* * * I cried when she asked me if I would take the place. I told her yes, if she wanted me to, I will. She said 'Everything is yours'. She says also 'We have lived and pulled together', she said, 'I have lived my life and you have got yours to live yet' ".

There being no evidence that Wyss induced or procured the making of the will, his presence at its execution raised no presumption of undue influence. Page on Wills, Lifetime Ed., section 836, and cases cited.

█ In so far as the testimony conflicted, the conclusions of the experienced trial judge, who saw and heard the witnesses, as expressed in his memorandum opinion, are important, and we have accorded them considerable weight. *Morley v. Silverton Hospital,* supra.

█ We are of the opinion that, on August 26, 1942, the testratrix was of sufficient mental capacity to dispose of her property by will, and that she executed the disputed will freely and comprehendingly, without undue influence on the part of the respondent.

The decree of the circuit court is, therefore, affirmed, without costs to any party.