Argued January 22, affirmed February 27, 1952

FIRST CHRISTIAN CHURCH IN SALEM *v.*
McREYNOLDS ET AL.

241 P. 2d 135

*Merlin Estep, Jr.,* of Salem, argued the cause for appellants. On the briefs were Hewitt, Estep & Sorensen.

*Roy Harland,* of Salem, argued the cause and filed a brief for respondent.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

WARNER, J.

This is a suit instituted by the plaintiff-respondent, The First Christian Church in Salem, Oregon, a corporation, for a declaratory judgment decreeing and adjudging that the plaintiff, as grantee, is the owner in fee simple and entitled to the immediate possession of certain real property in the city of Salem, Oregon, under a deed dated October 14, 1943, wherein Mary J. McReynolds, now deceased, was the grantor and wherein the grantor reserved a life estate to herself. The defendants are the only heirs and next of kin of the said Mary McReynolds and the wives of such heirs as are married, included for the apparent purpose of barring such rights of inchoate dower as they might have therein. From a decree and declaration in favor of plaintiff and against defendants, they appeal.

For a long time prior to October 14, 1943, and up to the date of her death, Mary McReynolds was a

devoted member of the plaintiff church, regularly participating in its services and activities and enjoying the consolation and solicitude of its pastor and members.

On or about December 2, 1943, she was adjudged insane in the circuit court for Marion county, Oregon, and 21 days thereafter she was released from the state hospital on parole to her sister, Mrs. Rose Voris. Coincident with the application for her commitment, Joan McReynolds, then the wife of the defendant, Floyd V. McReynolds, her son, petitioned for appointment as guardian of her person and estate. The request for this appointment was resisted by Mary McReynolds, resulting in the appointment of William Thielsen to that office on January 7, 1944. He continued in that capacity up to and including Mrs. McReynolds' death. Mary McReynolds was formally discharged from the state hospital on September 13, 1944. After her release as a parolee, she continued to make her residence in the city of Salem, living most of the time in the subject property until about the time that she died testate on September 11, 1948. The property was always operated as a rooming house attracting persons of modest income and sometimes of a nondescript character. At the time of her death she was approximately 82 years of age.

On this appeal the defendants allege two assignments of error, the substance of which was pleaded as two of the three separate defenses which they tendered in their answer to plaintiff's complaint: (1) that Mary McReynolds lacked mental capacity sufficient to execute the deed of October 14, 1943; and (2) that the deed is void by reason of alleged undue influence exercised upon her by the members and officers of the plaintiff church.

■ We turn to a consideration of the defendants' first assignment of error which challenges the competency of the grantor. Mental capacity to execute a deed is measured as of the date of the execution and delivery of the instrument. *Legler et al. v. Legler,* 187 Or 273, 308, 211 P2d 233; 28 Am Jur, Insane and Other Incompetent Persons, 697, § 59; 26 CJS, Deeds, 261, § 54. The deed, as we have noticed, was executed on the 14th day of October, 1943. The date of delivery is less certain. The minutes of the meeting of the church trustees held on November 7, 1943, carry a direction for the deed's recording. This was done on November 8. How long before November 7 the deed was delivered we do not know. In the absence of more exact information, we will assume that it was on November 7, approximately three weeks after the grantor formally acknowledged its execution before Ronald Glover, her attorney, friend and confidant.

■ A grantor is required to possess greater competency in the execution and delivery of a deed than a testator is required to possess in executing a will. *Legler et al. v. Legler,* supra, at page 307; *Gilliam v. Schoen,* 176 Or 356, 364, 157 P2d 682. The reason for this, as said in the Legler case, is that "Generally, a grantor, unlike a testator, must cope with another party to the transaction, that is, with a grantee."

■■ The test of mental capacity to make a deed requires that a person shall have ability to understand the nature and effect of the act in which he is engaged and the business which he is transacting. *Legler et al. v. Legler,* supra, at page 308; *Laughlin v. Ludgate,* 138 Or 442, 450, 6 P2d 20; *Miller et al. v. Jeffery et al.,* 129 Or 674, 687, 278 P 946. In the Miller and Legler cases we pointed out that a grantor must be able to reason, to exercise judgment, to transact ordinary

business and to compete with the other party to the transaction. In 6 Thompson, Real Property (Perm. ed.) 66, § 2982, it is said: "* * * It is not requisite, however, that he should be able to manage his business with judgment and discernment, or in a proper and prudent manner, for many sane men can not do this * * *." We have repeatedly held that neither old age, sickness, debility of body nor extreme distress incapacitates a party from disposing of his property, if he has possession of his mental faculties and understands the business in which he is engaged. See *Swank v. Swank,* 37 Or 439, 445, 61 P 846, and cases there cited.

To sustain their position the defendants lean heavily upon the grantor's subsequent commitment to the state hospital on December 2, 1943, and the appointment of a guardian for her which closely followed. These events transpired two or three months after the execution of the deed and one or two months after its delivery, i.e., if we adopt November 7 as the delivery date. Here the earlier dates of execution and delivery are the determining factors. *Legler et al. v. Legler,* supra.

■ In any event, the presumption of mental incapacity created by the appointment of a guardian is prospective in its operation from the date of the appointment and at best is only a disputable presumption which may be overcome by evidence to the contrary. *In re Estate of Beer,* 190 Or 15, 21, 222 P2d 1005; *In re Provolt's Estate,* 175 Or 128, 131, 151 P2d 736.

■ Appellants here are confronted with two rules which, by reason of the dating of the several transactions above referred to, take precedence over the presumption accruing by reason of the guardianship proceeding. The first rule to which we now refer presumes

the existence of mental competency prior to an adjudication to the contrary. As stated in 28 Am Jur, Insane and Other Incompetent Persons, 751, § 121, it is:

"It is well settled that the law will presume sanity rather than insanity, competency rather than incompetency; it will presume that every man is sane and fully competent until satisfactory proof to the contrary is presented. * * * In accord with the general presumption of sanity, there is a presumption that every man is capable of managing his own affairs, and is responsible for his own acts. Likewise, it is presumed that every man is capable of understanding the nature and effect of his contracts, and that he comprehends the effect and result of legal proceedings. Accordingly, it may be stated that as a general rule, all proceedings testing the competency of a person, or involving the competency of an individual to perform a certain act, as to execute a valid conveyance of property or a contract, start with the presumption of competency, and that this presumption may be relied upon until the contrary is shown. Thus, it will be presumed that a grantor was sane and competent at the time he executed a deed. * * *."

Also see *Schindler v. Parzoo,* 52 Or 452, 456, 97 P 755.

■■ The second rule is a corollary of the first, namely, that an adjudication of insanity by itself cannot relate to a prior time as evidence of incapacity. *Schindler v. Parzoo,* supra. Also see 44 CJS., Insane Persons, 90, § 32(2). This, however, may be overcome when it is shown " [1] that the mental condition of the ward had been the same for a considerable length of time, and [2] was the same at the time of the act to be affected by it as when the adjudication was had * * *." *Schindler v. Parzoo,* supra, at page 456; 28 Am Jur, Insane and Other Incompetent Persons, 751, § 121. In short, the mental condition of the ward, as discovered

at the time of the commitment, must have continued some time prior thereto, including the time of the acts which gave rise to the litigation challenging the mental capacity of the actor to accomplish the acts. Therefore, before the appellants can invoke in their aid any presumption operating retrospectively which might flow from the commitment or guardianship proceedings instituted about December 1, 1943, the burden is upon them to satisfactorily demonstrate that the mental condition of the ward as of that date had been the same for a considerable length of time prior thereto, including October 13, 1943, the date of the execution of the deed to the church, and November 7, 1943, the assumed date of its delivery.

■ This burden defendants have failed to sustain. The only scientific testimony bearing on the subject of the grantor's mental status was offered by plaintiff on rebuttal. It called to the stand Dr. B. F. Williams, who was on the medical staff of the Oregon State Hospital at the time of Mrs. McReynolds' commitment in 1943 and who personally examined her there shortly afterward. His conclusion as of that time was that there was " 'nothing observed to suggest a psychotic condition,' " meaning a disease or disorder of the mind. See Blakiston, New Gould Medical Dictionary, 833; Dorland, Medical Dictionary (22d ed.) 1239; Maloy, Medical Dictionary for Lawyers, 396. Her subsequent parole on December 23, 1943, and formal discharge on September 13, 1944, give further support to this professional conclusion. The record discloses that the defendants planned to call a "Dr. Stone," who we assume is Dr. Willard J. Stone and who the record shows examined Mrs. McReynolds at a later date. Neither Dr. Stone nor any other physician was called by defendants to testify on the subject of the grantor's

competency as of December 1, 1943, or any period prior thereto.

In lieu of expert testimony, the defendants elected to stand solely upon the testimony of Charles A. Ratcliff, a brother of the decedent grantor and uncle of the principal defendant, Floyd V. McReynolds, the grantor's son; Joan McReynolds, divorced wife of Floyd; and George A. Rhoten, a Salem attorney.

Neither the grantor's brother, son nor former daughter-in-law was able to advance any evidence which would warrant us in concluding that Mary McReynolds was not competent to execute or deliver the challenged instrument at the times she did those things. Much of the testimony of the brother goes to certain business transactions had with his sister over a period of nearly 20 years which were the source of much friction between the two and which occasioned a law suit brought by her against her brother. The son's testimony is tinctured and prejudiced with the very apparent bitterness born of disappointment in his failure to have been the beneficiary of his mother's bounty, both as a grantee to the property before us and under her will, wherein he was cut off with a two-dollar legacy. The ill feeling engendered between the mother and son during the former's lifetime was no doubt augmented by the two law suits in which they were adversely engaged following her release from the state hospital. Both suits resulted in judgments in favor of Mrs. McReynolds. In one, she secured a judgment for $1,000 against her son. No part of this judgment had been paid at the time of the trial of this matter.

The incidents and things that grantor's brother, son and former daughter-in-law stress as evidence of incompetence may be generalized as eccentricities not unusual to elderly people but which, taken alone, can-

not be exalted to the status of legal indices of a mental condition connoting the presence of insanity or which would discredit her competency to execute the church deed. She is revealed to us, and no doubt at times merited the conclusion, as one who was frugal to the point of miserliness, occasionally forgetful, and secretive as to certain little and relatively unimportant items and who would now and then, in her loneliness, talk to herself. It is true, too, that she sometimes engaged in a seemingly unsanitary and unnecessary pursuit of what the defendants generally described as taking food from garbage cans; but an examination of the entire record persuades us that this last trait of Mrs. McReynolds was overemphasized and overexaggerated. The brother and the son had never seen her do it, the former daughter-in-law but once, and then the character of her acquisitions did not merit designation as garbage. We are not disposed to measure Mary McReynolds' mental competency or conduct in the terms of esthetic and conventional niceties which might satisfy the standards of an ''Emily Post''. In so saying, we are not unmindful that one of America's most successful business women, Hetty Green, in her old age and even before, manifested miserly and eccentric habits, in some respects comparable to those of Mrs. McReynolds, which did her no honor but did so without exposing her mentality to challenge.

Although vested with some property, Mrs. McReynolds never had any great amount of income after her husband's death; and the problem of living was always more or less acute. Thrift was such a necessity that it attained in her later years the status of the miserliness which we have already mentioned. On the other hand, during this same period, and, indeed, after she left the state hospital in 1943, she continued to

collect her rentals, take care of her insurance and taxes, maintain a savings account and otherwise exhibit and make an intelligent and normal disposition of her business affairs.

The testimony of Joan McReynolds, Floyd's former wife, exhibited more tolerance of these things than did that of Mary McReynolds' brother and son. Joan is a graduate nurse. She lived with her former husband at the home of Mary McReynolds for about a month before the church deed was executed. She continued to make her home there for an indefinite period after the grantor's release from the hospital. From her testimony we glean, as did the lower court, that while she pointed to her mother-in-law's idiosyncrasies as indicative of insanity, it was evident, especially on her cross-examination, that she was hesitant to pronounce her insane and in reality viewed them as expected incidents of old age and that the things pointed out as evidencing mental incompetence were, in the last analysis, no more nor less than "lots of old ladies do."

The conclusions of the brother, the son and the son's former wife do not persuade us, any more than they did the trial judge, that Mary McReynolds was incompetent or incapable of executing or delivering the deed in favor of the church.

The testimony of Ratcliff and Floyd McReynolds that the grantor was mentally incompetent is thoroughly discredited by their own acts occurring subsequent to the execution and delivery of the church deed. It appears that for many years prior to Mrs. McReynolds' commitment, Charles Ratcliff had held title to two parcels of Mrs. McReynolds' Salem property, apparently as trustee and ostensibly in the hope of saving her equities therein. These are referred to by both parties as "the 12th street" and "the 23rd

street'' places. Mr. Ratcliff did succeed in saving them by use of the income therefrom and supplemental advances made by himself. In the fall of 1943, the unpaid portion of his advances amounted to approximately $500. About that time, he offered to deed that property to the defendant son for a price near that amount and very properly refused to close the deal until Mary McReynolds executed a quitclaim deed, as he put it, for his protection. Mrs. McReynolds agreed to execute such a deed but only in favor of her son, Floyd. This arrangement satisfied Ratcliff. The quitclaim deed was thereupon drawn at the request of Floyd in the offices of Rhoten & Rhoten, attorneys, though apparently not executed or acknowledged there. Ratcliff was wise and prudently cautious in demanding a quitclaim deed from his sister because it was his stewardship of this same property which, rightly or wrongly, had been the source of much distrust upon the part of Mary McReynolds and the occasion for many acrimonious discussions between them and which had before led to the law suit between the brother and sister. That quitclaim deed from Mary McReynolds to her son, Floyd, was executed and acknowledged on the *9th day of November, 1943, the day after* her deed to the plaintiff church was recorded and here stands as a monumental reproach to the representations of either Charles Ratcliff or Floyd McReynolds that Mrs. McReynolds was mentally incompetent to execute the deed which she gave to the plaintiff.

The only other testimony offered by the defendants which gives us pause is that of Mr. George Rhoten, a reputable member of our bar whose words compel respectful attention; but his memory when he was called to the stand was confusingly vague and we think with honest and good reason. We hesitate to extend

this opinion with lengthy excerpts from the transcript but here do so in order that our generalized evaluation of Mr. Rhoten's testimony will not be misunderstood or our conclusions with reference to it do him an injustice. He testified on direct examination that he had known Mrs. McReynolds at least two or three years before she was placed under guardianship and that his first acquaintance began when she called at his office to see Mr. Avery Thompson, then associated with him. In their brief, appellants assert that "Mr. Rhoten * * * had refused to draw the deed for her" (meaning the deed to the church). We do not think this is warranted by the record from whence we quote:

"Q Were you ever approached—Did she suggest to you the matter of deeding her property away to anybody?

"A Well, I wish my mind was clearer on that. I have talked with Mr. C. A. Radcliff [sic] about it and he tells me at one time she approached me about deeding her property and that I didn't—I felt she was not mentally capable of doing it, and I asked him what deed it was and he said it wasn't the deed to the church and I don't recall of being asked to prepare a deed to anyone, but I do now recall Mrs. McReynolds as being uncertain in her mind for many months before the time she was placed under guardianship, and I felt that she was not capable for many months before the guardianship of handling her business affairs in a wise and prudent manner. I think I can say this from my observation of her mental condition for the months preceding the time she was committed and was placed under guardianship, that her capacity to transact business was exceedingly doubtful."

It will be observed that Mr. Rhoten did not say that she was incompetent to transact business but rather that her capacity was doubtful. He did speak of her inability, in his opinion, "of handling her business

affairs in a wise and prudent manner"; but as we have hereinbefore pointed out, it is not requisite that the grantor be able to manage his business with judgment, discernment or "in a proper and prudent manner" for, as we said, "many sane men can not do this." 6 Thompson, Real Property (Perm. ed.) 66, § 2982. We again note that the quitclaim deed from Mary McReynolds to her son, executed November 9, 1943, was drawn in the offices of Rhoten & Rhoten but hasten to add that the record does not indicate who in that office was responsible for its drafting.

We adopt as our judgment concerning the testimony of Mr. Rhoten the conclusion of the trial judge, who expressed himself in his opinion as follows:

"* * * An examination of his testimony will reveal, however, that Mrs. McReynolds was principally concerned with a Mr. Avery Thompson, who was associated with Mr. Rhoten in law practice and from whom she had sought advice, and that his relations with her were incidental. * * *."

Under all the circumstances here shown, we are compelled to accept the contradictory testimony of Mr. Ronald Glover, the attorney who drew the deed for Mrs. McReynolds in favor of the church, of which he was not a member, and who had known her a great number of years in the capacity of counselor and friend, when he said that she was mentally capable at the time of her gift to the church.

Appellants' first assignment of error is without merit.

We will now give attention to appellants' second assignment of error suggesting, as it does, that the grantor was subjected to the undue influence of the pastor and members of the plaintiff church. Here again the appellants fail to produce conviction.

The record is eloquent that the idea of favoring the church to which she had so long been devoted had been a matter in her mind many, many years before she translated it into the form of a deed. It was known to a multitude of persons with whom she had discussed it. We are justified in saying that the giving of the deed was the culmination of six or seven years of reflection. Her brother, Charles Ratcliff, knew of it and also her son and his former wife. There is, indeed, enough in the record to warrant the inference that one of the reasons impelling Floyd and his wife to come from Portland and move in with his mother in the summer of 1943 was a desire to thwart that decision of his mother, coupled with a hope, approximating a determination on his part, that he, not the church, would be favored with that gift.

■ We can find nothing that justifies an inference that the church through its pastor, officers or members ever suggested the gift or did anything to accelerate its consummation.

*In re Knutson's Will,* 149 Or 467, 489, 41 P2d 793, we adopted and applied the definition of the term "confidential relationship," as employed by the court in *Zeigler v. Coffin,* 219 Ala 586, 123 So 22, 63 ALR 942, and reading:

" 'Confidential relations exist "wherever confidence is reposed and accepted, and the one has it in his power, in a secret manner, for his own advantage, to sacrifice those interests of the other which he is bound in honor and good conscience to protect. 1 Story, Eq. Jur., § 323. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another." Coghill v. Kennedy, supra, pages 658, 659 of 119 Ala. (24 So. 468); Raney v. Raney, supra, page 34 of 216 Ala. (112 So. 316).' "

■ There is not one iota of testimony to indicate that anyone of the plaintiff church enjoyed such a relationship with the grantor, unless it can be said that membership with and devotion to a given church, accompanied by no more than the usual social intercourse between the pastor and its members, ipso facto creates such a relationship. Such a conclusion we are not willing to subscribe to.

■ The contested deed was prepared by Mr. Glover at Mrs. McReynolds' request and executed and acknowledged in his presence alone. Before the signing, he read and explained it to her. These are circumstances which compel the highest consideration in a matter of this kind. See *Tate v. Holmes,* 76 Fed 664, 667 (9th Cir.), where the deed of an elderly person to Oregon property was challenged upon the same legal grounds asserted here.

■ Approximately five years elapsed between the delivery of the deed and Mrs. McReynolds' death. Many times after its execution and even after her commitment to the state hospital, she referred to the transaction with apparent pride and satisfaction. After her release she had no hesitation in moving against those who she believed had milched her, as witnessed by her successful litigation with her son. Moreover, her guardian was cognizant of her gift to the church; and it was his duty to move to set aside the conveyance if he had any reasonable grounds for believing that his ward had been overreached. Indeed, the relations between Mrs. McReynolds and her guardian were such that had she indicated any regret concerning her gift, we are confident that he would have brought the matter into court long before it became necessary for the church to do so on its own motion because of Floyd

McReynolds' stubborn resistance to the church's right of possession.

It is significant, we think, that the defendant, Floyd McReynolds, had no support in court from any of the other defendants who were his mother's kin. He is her only relative who orally expressed surprise or disappointment because of Mrs. McReynolds' gift. He, in reality, is the only defendant with an interest and is the only person who, without one note of filial regard, unabashedly and with undisguised bitterness dishonors his mother's memory in an effort to accomplish his selfish purpose. Children of deceased parents so minded give to their testimony a quality which breeds a distrust and suspicion and makes it difficult for a court to accept it as evidence of truth. For this conclusion we have precedent. *In re Detsch's Estate,* 191 Or 161, 229 P2d 264, 267.

The decree of the lower court is affirmed.