Argued February 6, reversed April 2, 1976

HOLM, *Respondent,*

*v.*

EPPING, *Appellant.*

547 P2d 600

*Elton T. Lafky,* Salem, argued the cause for appellant. With him on the briefs was James Richard Scruggs, Jr., Salem.

*Ralph W. G. Wyckoff,* Salem, argued the cause and filed a brief for respondent.

PER CURIAM.

## PER CURIAM.

Plaintiff brought this suit to foreclose a note and mortgage. The defendant, the maker of the instruments, answered alleging that the instruments were void and should be rescinded because he was mentally incapable of validly executing the instruments. The trial court held for plaintiff and defendant appeals.

The defendant, who is now 56 years old, employed the plaintiff, a nurse, to take care of his wife. After defendant's wife died the parties continued to see one another and plaintiff testified they talked of marriage. In April 1972 defendant suffered a cerebral hemorrhage and required serious surgery. After a month or more of hospitalization he was moved to a nursing home.

Plaintiff testified that she had not been fully paid for nursing defendant's wife. She also testified that she had loaned defendant money to pay bills and that sometime before defendant was hospitalized he acknowledged in writing the amount owing plaintiff and said he would pay her by conveying to her a half interest in an unimproved parcel of real property.

Plaintiff retained an attorney who prepared a note for the amount she said was owing and a mortgage for the half interest in the real property which defendant promised to give her. Plaintiff told her attorney of defendant's surgery, that he had a "loss of mind," was violent, and that he "drifted back and forth." She also told him Dr. White was the treating physician.

On July 21, 1972, the attorney, with plaintiff and her father, went to defendant's room at the nursing home. The attorney testified that defendant recalled meeting the attorney's father and also remembered agreeing to give plaintiff half interest in the parcel of unimproved land. Defendant was shown some notes computing the amount owed and bearing his signature. He said it was his signature but he wondered about some other writing on the paper. He knew the

[ 615 ]

extent of his property and when asked who his children were, he answered that his oldest son was Tom. The attorney explained the note and mortgage to defendant. Defendant responded that the rate of interest was agreeable but he wanted five years instead of one within which to pay the note. The note has such a change written on it. The defendant then executed the instruments.

The attorney spent about one-half hour with defendant and thereafter dictated a memorandum of what had transpired.The memorandum was transcribed and received as an exhibit.

The defendant called as a witness the administrator of the nursing home, a registered nurse. She brought along the medical records of the nursing home and testified from those and her personal knowledge. She testified:

> "Mr. Epping had to be frequently, and most of the time, in restraints. He had to be closely watched or he ran off from us on several occasions, at which time we even had to call the police to try to help us find him. He was heavily medicated with psycotrophic drugs everyday."

She testified that defendant could carry on a conversation with her but later in the day he would not remember it. She testified that defendant could not understand "the nature or consequence of the acts that he was doing or performing at that time."

She also testified she told the attorney that defendant was not competent to sign any legal documents and was probably going to be committed to the State Hospital (for the mentally ill). The attorney's notes state that the administrator told him that defendant "probably would not be able to execute these documents * * * [that] he was under heavy sedation and suggested possibly that I talk with Doctor White the treating physician."

Dr. White, a neurosurgeon with some training in psychiatry, was not able to personally testify. His

deposition was taken and the parties stipulated the court could consider his testimony as if he testified in person.

Dr. White, who performed the surgery necessitated by the hemorrhage, testified that the hemorrhage caused destruction of the septal area of the brain which is "associated with profound memory and mental defects." After the surgery he continued as defendant's physician. He saw the defendant on June 22, 1972, and next on July 22, 1972, the day after defendant signed the documents. He testified that on July twenty-first, "He [defendant] was not at all by any stretch of the imagination competent to manage his own affairs" and he "certainly" would not "know the nature and consequences of any acts he performed during that period of time." Dr. White continued his care of defendant and last saw him a month or two before trial. He testified that defendant had improved but was still not competent at the time of trial. On cross-examination plaintiff asked:

"Q Now in July 21, 1972, was his mental condition such that he would be able to know what property he owned?

"A I am certain not, Mr. Wyckoff, because this was absolutely the worst time of it. This is when he was wandering about and had to be restrained."

Dr. White stated:

"* * * People in Fritz's [defendant] condition often do what we call confabulate. They can carry on what superficially would appear to be a very logical and reasonable conversation, but you get into it in depth and say, well, now, if I may give an example * * * and yet when you really pin him down and get into it, he is very profoundly handicapped."

On July 19, 1972, two days before the documents were executed, Dr. White wrote to the State Hospital describing defendant's condition and stating: "This has resulted in a profound memory deficit and disorders in mentation in other areas which render it impossible for Mr. Epping [defendant] to be able to

conduct his own affairs. In addition, he requires constant supervision and becomes agitated practically every day."

The defendant was admitted to the State Hospital on July 28, 1972, six days after he signed the documents, and remained there about two months. He was not called as a witness.

This is an equity case and, therefore, we try it de novo. The trial court made no findings but wrote a letter opinion. The court stated it was impressed with the care the attorney took to inquire into the capacity of defendant and immediately recording his impressions. The trial court viewed Dr. White's testimony, on the other hand, as "somewhat remote and purely opinion evidence."

We give the findings of the trial court "great weight" or find them "persuasive." *Martin v. Good,* 234 Or 291, 296, 381 P2d 713 (1963); *Carlson v. Pryor,* 262 Or 131, 134, 497 P2d 202 (1972). "However, when from the record itself it appears to us that the testimony is not convincing, we make our own individual appraisal." *Norman v. Jerich Corporation,* 263 Or 259, 265, 501 P2d 305 (1972).

In this case we find the evidence that the defendant was incompetent to be much stronger than the contrary evidence. The treating physician was the most qualified to give an opinion on competency, an issue which necessarily requires opinion evidence. As this testimony was by deposition, the trial court was in no better position to weigh it than we are. The next most qualified witness was the nursing home administrator who was qualified by training and constant observation of the defendant. Both of these witnesses were extremely positive in their opinion that the defendant was not competent.

On the date defendant signed the instruments Dr. White and the nursing home administrator were in the process of trying to transfer him to the State Mental

Hospital. He was accepted six days later and kept there for about two months. This is strong substantiation of the testimony that defendant was not competent.

The presumptions of sanity and competency and that every person is capable of managing his own affairs are of little assistance in this case.[1] It is uncontradicted that defendant suffered brain damage and is not fully competent; the question is the extent of his incompetency.

The defendant may owe plaintiff for her services and money lent. Our decision will not bar her from attempting to recover any such amounts. We hold, however, that at the time the instruments were signed the defendant was incompetent to contract that he owed a certain amount, to incorporate the amount and the terms of payment into a note or to convey a security interest in his property to plaintiff.

Reversed.

---

[1] See *First Christian Church v. McReynolds*, 194 Or 68, 74, 241 P2d 135 (1952), for a statement of these various presumptions.